217 So.2d 304 (1968)
Mrs. John De Raismes STOREY, Mr. and Mrs. Richard Conley, Mr. and Mrs. George Fichter, Dr. P.M. Boyd, Jr., et Ux., et al., Petitioners,
v.
William T. MAYO, Chairman, and Edwin L. Mason, and Jerry W. Carter, Commissioners, As and Constituting the Florida Public Service Commission, Respondents.
No. 37203.
Supreme Court of Florida.
November 6, 1968.
Rehearing Denied December 12, 1968.
*305 Irving Peskoe, pro se, and for Robert L. Lewis, for petitioners and others directly affected.
Robert M.C. Rose, Tallahassee, for Florida Public Service Commission.
*306 Phillip Goldman of Scott, McCarthy, Steel, Hector & Davis, Miami, for Florida Power & Light Co.
Vernon W. Turner of Turner & Hodson, Homestead, for City of Homestead.
THORNAL, Justice.
By petition for a writ of certiorari we have for review an order of the Florida Public Service Commission which approved a territorial service agreement between two electric utilities, one being privately-owned and regulated by the state, the other being municipally owned and unregulated.
We must decide whether the subject agreement is invalid as being in restraint of trade, contrary to the public interest, or violative of equal protection requirements.
The City of Homestead, a municipal corporation, owns its electric utility system. It serves all residents in the City and some in adjacent non-municipal areas. Florida Power and Light Company is a privately-owned electric utility. It serves extensive areas along the east coast, lower west coast and south central sections of Florida. Included in the Company's service territory is the non-municipal area surrounding Homestead. Because of the municipal operation the Company is not permitted to serve customers inside the city limits. However, prior to the subject agreement, the Company and the City actively competed for customers in the suburban areas. This, of course, required duplicating, paralleling and overlapping distribution systems in the affected areas. This duplication of lines, poles, transformers and other equipment not only marred the appearance of the community but it also increased the hazards of servicing the area. Such overlapping distribution systems substantially increase the cost of service per customer because they simply mean that two separate systems are being supplied and maintained to serve an area when one should be sufficient. Obviously, neither system receives maximum benefit from its capital invested in the area. The ultimate effect of this is that the rates charged in the affected area are necessarily higher, or, alternatively, the customers in some other part of the system must help bear the added cost. It is the latter which most often happens in an extensive system-wide operation, such as that conducted by the Company here.
In order to end the unsatisfactory effects of this type of expensive, competitive activity, the City and the Company, on August 7, 1967, executed the territorial service agreement which is the subject of this litigation. In effect it established areas of service around the City in the suburban territory. It provided that twelve (12) commercial and sixty-six (66) residential customers would be transferred from the City to the Company. Thirty-five (35) commercial and three hundred sixty-three (363) residential electric customers were transferred to the City by the Company. There were provisions for reciprocal transfers of facilities and a reservation by the City of authority to continue to serve certain municipally-owned property located in the Company service area. On November 1, 1967, the City Council of Homestead adopted a resolution providing that electric utility rates to be charged residential customers in the proposed service area would "be established as those now existing in the proposed service area" and served by the Company. This resolution is a part of the record which also reveals that over a period of forty-three (43) years electric rates charged customers of the city have never been raised.
The Company applied to the Florida Public Service Commission for approval of the agreement. A hearing, pursuant to notice, was held at the Homestead City Hall on November 8, 1967. Witnesses for the City and Company were presented. None of the customers being transferred from City to Company appeared. Seven, including petitioners, appeared in opposition to the transfers by the Company to the City. Petitioners now here claim to represent a class numbering more than one *307 hundred in this category. At the hearing, the City expressly stated that it was not conceding Commission jurisdiction over the municipal operation. By a 2-1 vote the Commission approved the agreement. Petitioners, who were among the protestants, seek review pursuant to Fla. Stat. § 350.641 (1967), F.S.A.; Fla. Stat. § 366.10 (1967), F.S.A.
The petitioners contend that the notice of the hearing was insufficient; that the proposed agreement is contrary to the public interest and is in restraint of trade; and that it denies to them both equal protection and due process of law. They claim that the impact of the agreement is to force them to take service from an unregulated instead of a regulated utility. They insist that the rates and service of the latter are superior to the former, and that the agreement eliminates competition.
The established state policy in Florida is to supervise privately-owned electric utilities through regulation by a state agency. By the same policy municipally-owned electric utilities are expressly exempted from state agency supervision. Fla. Stat. § 366.11 (1967), F.S.A. It was for this reason that in the instant matter, the City pointedly saved itself against submission to Commission jurisdiction. Under Florida law, municipally-owned electric utilities enjoy the privileges of legally protected monopolies within municipal limits. The monopoly is totally effective because the government of the City, which owns the utility, has the power to preclude even the slightest threat of competition within the city limits. On the other hand, the rates and services of the privately-owned electric companies are regulated by the respondent Commission. Fla. Stat. Ch. 366 (1967), F.S.A. Service areas are not specifically controlled by requirement of certificates of public necessity and convenience. However, in some measure the Commission does control the areas served by the companies by virtue of its prescribed powers, including the specific power "* * * to require repairs, improvements, additions and extensions to the plant and equipment of any public utility reasonably necessary to promote the convenience and welfare of the public and secure adequate service or facilities for those reasonably entitled thereto * * *." Fla. Stat. § 366.05 (1967), F.S.A. The regulatory powers of the Commission, as announced in the cited section, are exclusive and, therefore, necessarily broad and comprehensive. Fla. Stat. § 366.03 (1967), F.S.A.; Florida Power & Light Co. v. City of Miami, 72 So.2d 270 (Fla. 1954).
The powers of the Commission over these privately-owned utilities is omnipotent within the confines of the statute and the limits of organic law. Because of this, the power to mandate an efficient and effective utility in the public interest necessitates a correlative power to protect the utility against unnecessary, expensive competitive practices. While in particular locales such practices might appear to benefit a few, the ultimate impact of repetition occurring many times in an extensive system-wide operation could be extremely harmful and expensive to the utility, its stockholders and the great mass of its customers. Tampa Electric Co. v. Withlacoochee River Electric Coop., 122 So.2d 471 (Fla. 1960). It was a recognition of this basic concept that led us to approve territorial service agreements between two regulated utilities. Peoples Gas System, Inc., v. Mason, 187 So.2d 335 (Fla. 1966); City Gas Co., v. Peoples Gas System, Inc., 182 So.2d 429 (Fla. 1965). In the last-cited cases we recognized the importance of the regulatory function as a substitute for unrestrained competition in the public utility field. We there noted that often a regulated or measurably controlled monopoly is in the public interest, and that in the area of public utility operations competition alone has long since ceased to be a potent or even a reasonably efficient regulatory factor.
An individual has no organic, economic or political right to service by a *308 particular utility merely because he deems it advantageous to himself. If he lives within the limits of a city which operates its own system, he can compel service by the city. However, he could not compel service by a privately-owned utility operating just across his city limits line merely because he preferred that service. In the instant situation, these petitioners have not been denied equal protection because they occupy the same status as all users of the municipal power. In the event of excessive rates or inadequate service their appeal under Florida law is to the courts or the municipal council.
The obligation of the respondent electric company is to furnish reasonably sufficient service to applicants therefor "* * * upon terms as required by the commission * * *" Fla. Stat. § 366.03 (1967), F.S.A. When the Commission approved the subject agreement, it, in effect, informed the respondent electric company that it would not have to serve the particular area because under the circumstances it would not be reasonable to require it to do so. Fla. Stat. § 366.05, F.S.A., supra. There was certainly competent, substantial evidence to support this conclusion and the Commission had the power to act in the premises. The petitioners here are in the posture of customers demanding service of a particular regulated utility. The regulatory agency has heard the matter and with evidentiary support has concluded that under the circumstances it would be unreasonable to require this utility to render the service. This in substance is the ultimate impact of the arrangement which the Commission has approved.
Petitioners' attack on the notice of the hearing is without merit. A formal notice in adequate detail was published. In addition the City notified all of its affected customers by a personally delivered letter well in advance of the hearing.
The arrangement under review was reached after several years of negotiations between the City and the Company. It received the unanimous approval of the City Council. Following a well-publicized hearing it has been approved by a majority of the respondent Commission which is burdened with the duty of measuring its judgment by the dictates of the public convenience and welfare in this type of situation. When we measure the obligations of the respondent electric company by the responsibilities placed upon it under Fla. Stat. Ch. 366 (1967), F.S.A., and especially in view of the extensive regulatory powers of the respondent Commission, we see no reason to disturb the subject order.
The petition for certiorari is denied.
It is so ordered.
THOMAS, ROBERTS, DREW and ADAMS (Ret.), JJ., concur.
CALDWELL, C.J., dissents.
ERVIN, J., dissents with Opinion.
ERVIN, Justice (dissenting).
Once again we have a case where the Florida Public Service Commission has approved a territorial agreement between two utilities over the objections of a large number of consumers of one of the utilities. See earlier cases: City Gas Co. v. Peoples Gas System, Inc., Fla., 182 So.2d 429, and Peoples Gas System, Inc., v. Mason, Fla., 187 So.2d 335. One is an electric utility municipally operated; the other is a private electric power company under the regulation of the Public Service Commission. Despite the fact that the Legislature has never given the Public Service Commission the express power to approve such agreements (and certainly not the power to approve agreements where one of the utilities is municipally operated, over which the Commission has no regulatory jurisdiction), nevertheless the objecting customers who have been served by the private company, some for many years, now have been "transferred" *309 by the agreement from the status of customers of the private electric power company to the status of new customers of the City.
I note conclusions in the majority opinion that the purpose of the territorial agreement is to curtail "duplicating, paralleling and overlapping distributions systems in the affected areas"; that this "overlapping" marred the appearance of the community and substantially increased the cost of service per customer "because they simply mean that two separate systems are being supplied and maintained to serve an area when one should be sufficient." The objecting customers give not the slightest indication they are dissatisfied with the cost of service to them. On the contrary, they allege they are content and wish to remain paying customers of the private utility. From my reading of the record I find no substantial support for these conclusions or that any comprehensive hearing was afforded Petitioners to voice their objections.
On the basis of this record, I conclude the convenience of the two utilities  primarily the interest of the municipal electric utility  was the paramount objective served by the agreement, rather than the interest of the consumers. I get the impression from the record the private electric company yielded to the demands of the municipality to surrender the subject suburban territory in order to "keep peace" with the City, since there had been wrangling between the two utilities concerning which should provide utility service in the subject area for a number of years. I do not subscribe to the view that long standing consumers of a particular electric company have no substantial interest in the status quo of their existing service, but may be required by the private utility, with the approval of the Commission, to thereafter obtain electric power from the City. Especially is this so where there is no showing the private company will suffer economic loss by continuing to serve such consumers, but is complacently agreeable for public relations or policy considerations to yield these consumers to the City.
In 43 Am.Jur. Public Utilities and Services, § 78, the text at page 621 reads in part:
"* * * An electric company may not cease to serve the public because the city, in constructing a competing system, has created conditions rendering continued service dangerous and refuses to alter them. [Citing Alabama Power Co. v. City of Guntersville, 236 Ala. 503, 183 So. 396, 119 A.L.R. 429.] Where a public service company does not show that a branch of service which it wishes to discontinue results in a loss, permission to discontinue will generally be refused. * * *" [Citing 21 A.L.R. 578.]
In conclusion, it appears to me that customers who have long been served by a private power company have a substantial property right to continue receiving electric current from that company; that whatever competition exists between utility companies should not be looked upon with disfavor but should be eliminated only in extreme circumstances where it is apparent the economic interests of the utilities, or of one of them, are being jeopardized by such competition to the disadvantage of the consuming public; that unless the Legislature specifically grants authority to the Public Service Commission to approve divisions of service territory between utility companies and "transfer customers" therein, such authority should not be implied by the Commission, and especially should this be so where the Commission has no regulatory jurisdiction supervising the supplying of power by municipal utilities.
I believe the majority decision will come as a surprise to electricity consumers who reside within suburban areas outside cities and have long been served by a private utility company that there is a possibility that at some time in the future they may be "transferred" as customers from the private electric company and become customers of the adjacent city electric utility.