138

**OLTMAN, et al v. CITY OF POMPANO BEACH.**
No. 67-3381.
**OLTMAN, et al v. CITY OF POMPANO BEACH.**
No. 68-6754.
Circuit Court, Broward County.

November 7, 1977.

Roger H. Harper, Boca Raton, and Howard C. Osterman, Margate, for the plaintiffs.

Thomas P. Quinn, Lauderdale-By-The-Sea, for the defendant.

STEPHEN R. BOOHER, Circuit Judge.

*Final judgment:* This case was tried before the court without a jury. The presentation of evidence has been received by the court intermittently since September 22, 1971. The issues in this protracted and arduous litigation raise questions of first impression in this state; hence, a detailed chronology of the suit is set forth to aid in better understanding the findings and conclusions of the court.

1. On July 29, 1966, the identical plaintiffs in the first of these consolidated suits instituted a class action in this court, at Case No. C66-3316 - Judge Weissing, against the defendant city of Pompano Beach, on behalf of themselves and approximately 2,500 other non-resident consumers of the city's waterworks system, complaining of the adoption of Pompano Beach City Ordinance 65-71, effective October 1, 1965. In the former suit, the plaintiffs alleged that prior to the adoption of this ordinance they and the other non-resident customers paid water rates 50% higher than the rates charged residents of the city, but that after the effective date of the ordinance their rates were increased to double the rates charged residents, despite the fact that the operation of the municipal waterworks was returning a better than reasonable profit to the city. The plaintiffs further asserted that the city was under a common law obligation to supply water to all its customers at just and reasonable rates, without discrimination, and that the adoption of Ordinance 65-71 breached that obligation, constituted an arbitrary and capricious deprivation of the property of the plaintiffs without due process of law, and resulted in an unconstitutional

discrimination against them individually and as a class. Finally, they alleged that they had no other source of potable fresh water and were under legal obligation to continue using the city water. They prayed that Ordinance 65-71 be adjudged unconstitutional, null, and void ab initio; that the city and its officers, representatives, and employees be restrained and enjoined from collecting the increased water charges from the plaintiffs; and that all overcharges from the effective date of the ordinance be refunded.

2. The city answered that suit, denying the material allegations, and affirmatively alleging that the city was not a public utility, and that its rates were a matter of private contract and not subject to regulation.

3. On motion of the defendant, the Honorable Louis Weissing, Circuit Judge, entered a decree on the pleadings on January 5, 1967, dismissing the plaintiffs' complaint with prejudice. The court found as a matter of law that a municipality serving water to residents and non-residents is not a public utility, that such a municipality is not under the common law obligation of public utilities to supply their customers at reasonable rates, and that such municipalities and the rates which they charge for their water service are governed by and subject only to the law of private contract. *Village of Virginia Gardens v. City of Miami Springs*, 171 So.2d 199 (Fla. 3d DCA 1965). Further, the court held that it is clearly competent for the city to classify non-residents in a separate category and to charge them higher rates than those charged residents without running afoul of constitutional prohibitions against deprivation of property without due process of law or equal protection of the laws. *Childs v. City of Columbia*, 87 S.C. 566, 70 S.E. 296 (1911); *Collier v. City of Atlanta*, 178 Ga. 575, 173 S.E. 853 (1934); *Barr v. City Council of Augusta*, 58 S.E.2d 823 (Ga. 1950); *Lee v. Colorado Springs*, 136 Colo. 248, 315 P.2d 822 (1957). Finally, the court held that where the right of a person to receive services from a municipality is based solely on a voluntary contract with it, which the court found to be the case, the rights and obligations of the parties must be determined in accordance with the principles of contract law and in the same manner as any other private contract, and the court cannot inquire as to whether the provisions of the contract are arbitrary, unreasonable, or discriminatory. *City of Moultrie v. Burgess*, 212 Ga. 22, 90 S.E.2d 1 (1955).

4. The plaintiffs filed no petition for rehearing and no appeal was taken.

5. On May 26, 1967, the same plaintiffs filed the first of these two consolidated suits against the city, again on behalf of them-

selves and the approximately 2,500 non-resident consumers of the city's water system, likewise complaining of the adoption of the same Ordinance, 65-71. In this suit, however, the plaintiffs allege that the city, in the operation of its waterworks in a proprietary capacity, is conducting a common law monopoly; that it is not subject to regulation or control in any form or manner by the state of Florida or any of its governmental branches, departments, or agencies; that implicit in the "franchise" from the state of Florida, contained in the city charter, to operate its waterworks "as a sanctioned monopoly," is the strict obligation on the part of the city "to operate such monopoly to the extent that it will be beneficial, rather than prejudicial, to the welfare of the public or a large portion thereof;" and that by the establishment and collection of its discriminatory, unreasonable, and excessively high rates for non-residents, the city is operating its monopoly in a form and manner which is odious, intolerable, contrary to public policy and common right, and hence illegal. The plaintiffs asked that ordinance 65-71 be invalidated and declared illegal, unconstitutional, null, void, and of no effect; that the city be restrained from collecting the increased water charges; and that the plaintiffs and others in the class be awarded money damages for the excess charges paid to the city since the date of the adoption of the ordinance.

6. The city answered, denying the material allegations, and affirmatively alleging that the decree on the pleadings entered January 5, 1967, at Case No. C66-3316, was res judicata of all issues, matters, and things pleaded in the complaint; that the plaintiffs, being identical in both suits, had split their causes of action; that the plaintiffs, by virtue of the decree on the pleadings, were estopped from bringing the instant lawsuit; and that the complaint showed on its face that the elements of an alleged common law monopoly were not applicable in that the city in providing the services in question was acting, as alleged, pursuant to specific statutory authority. Again, the city filed a motion for judgment on the pleadings.

7. At the hearing on its motion for judgment on the pleadings, the city urged that a comparison of the complaints and prayers for relief in this suit and the prior suit revealed an identity of the things sued for, identity of persons and parties to the action, and identity of the quality or capacity of the persons for or against whom the claim was made. Cf. 19 Fla. Jur., *Judgments and Decrees*, §111. In addition, the city argued that both complaints relied on essentially the same facts and evidence, and that the causes of action were substantially the same. The city concluded that an identity of causes of action existed between the two suits, and that the plaintiffs, having litigated the cause of action on the

theory of their choosing, could not choose a different theory and relitigate the identical cause once the issues had been resolved against them. *State Road Department v. Lewis,* 156 So.2d 862 (Fla. 1st DCA 1963), aff'd in part and rev'd in part, 170 So.2d 817 (Fla. 1964); 19 Fla. Jur., *Judgments and Decrees,* §113.

8. The plaintiffs contended that this suit proceeded on a different cause of action and that res judicata was per se inapplicable. *Stadler v. Cherry Hill Developers, Inc.,* 150 So.2d 468 (Fla. 2d DCA 1963); *Hardee v. Gordon Thompson Chevrolet, Inc.,* 154 So.2d 174 (Fla. 1st DCA 1963).

9. In denying the city's motion for judgment on the pleadings, this court was mindful of the fact that the doctrine of res judicata should not be so rigidly applied as to defeat the ends of justice. *Universal Construction Co. v. City of Fort Lauderdale,* 68 So.2d 366 (Fla. 1953); *Wallace v. Luxmoore,* 156 Fla. 725, 24 So.2d 302, 304 (1946); *Stadler v. Cherry Hill Developers, Inc., supra.* The court found this principle particularly applicable in this case because, as noted earlier, the issues here presented appear to raise questions of first impression in this state, which should not be disposed of summarily, but only after a trial on the merits, and because the court felt that the plaintiffs were entitled to and had not had their day in court. In this regard, the court noted that the weight of authority from jurisdictions which have considered the matter supported a cause of action against a municipality operating a utility discriminating in rates between customers residing within and without a municipality. See 4 A.L.R.2d 595, and cases cited. Moreover, Florida law recognizes the authority of our courts to relieve against discriminatory or unreasonable rates. *Cooper v. Tampa Electric Co.,* 154 Fla. 410, 17 So.2d 785, 54 P.U.R. (n.s.) 210 (1944). Accordingly, this court entered its order of February 6, 1969, denying the city's motion for judgment on the pleadings. The city took an interlocutory appeal from the order of denial, and the appellate court affirmed. *City of Pompano Beach v. Oltman,* 228 So.2d 610 (Fla. 4th DCA 1969).

10. Meanwhile, the city, by adoption of Pompano Beach City Ordinance 68-59, again increased the water rates charged to the plaintiffs and the non-resident class whom they represent, this time doubling the rates charged the non-residents compared to those charged to in-city consumers. The plaintiffs in the second of these consolidated suits filed a new class action attacking the new rate increase ordinance upon the same theory set forth in the first suit. The causes were consolidated and ultimately proceeded to trial.

11. In passing, it should be pointed out that the provisions of Section 180.191, Florida Statutes, effective December 8, 1970,

which limit the amount of municipally-owned water utility rate surcharges to customers outside the municipal boundaries, do not apply to the overcharges complained of in this litigation. These consolidated actions relate to the years 1966 through 1970. It further should be noted that in Florida, municipally-owned utilities are exempt from regulation by the Public Service Commission. See: Sections 366.02 and 367.022(2), Florida Statutes.

12. In *Storey v. Mayo,* 217 So.2d 304 (Fla. 1968), the Supreme Court of Florida, at page 307, recognized that

"Under Florida law, municipally-owned electric utilities enjoy the privileges of legally protected monopolies within municipal limits."

Later, on the same page, the court noted that

". . . often a regulated or measurably controlled monopoly is in the public interest, and that in the area of public utility operations competition alone has long since ceased to be a potent or even a reasonably efficient regulatory factor."

While *Storey* is factually unrelated to the case at bar, its adherence to the principles of common law monopoly operation with respect to unregulated municipally-owned utilities in Florida supports the causes of action here against the city of Pompano Beach for unwarranted outside-consumer charges for water during the five years in issue. And based upon the evidence received, the court is convinced that the said overcharges were arbitrarily imposed and unreasonable in application.

13. The city has argued persuasively that it is not the proper function of this court, once rates are found to be discriminatory and unreasonable, to engage in rate-making or to set the rate itself. *Cooper v. Tampa Electric Co.,* 154 Fla. 410, 17 So.2d 785 (1944). If this court felt it were permitted to do so, it would not hesitate to order a substantially larger refund than is ultimately herein determined, based upon the extensive actual surpluses which the city transferred from the water department to the general fund in the years in question.

14. The court accepts the premise that prescribing the rates to be charged is the legislative prerogative of the city commission of the city of Pompano Beach; as a starting point, therefore, the court accepts the rates established for customers within the city by the two challenged ordinances. In comparing the rates thus established with the rates charged to consumers outside the city limits, the court has taken into consideration those additional expenses which are justified by the difference in cost of producing,

furnishing, and delivering of water service to customers outside the city. *Clay Utility Company v. City of Jacksonville*, 227 So.2d 516 (Fla. 1st DCA 1969); *Cooper v. Tampa Electric Co., supra.* But to the extent that the substantial difference in rates is not justified by additional costs and cash needs of the waterworks system, the court has found the excess rates to be unjustly discriminatory and illegal. In summary, therefore, the court has equalized the rates charged to the two classes of consumers, and has determined the unreasonable and arbitrary extent of the rates charged consumers outside the city (the plaintiff class) by analyzing and comparing them with those charged consumers within the city (the defendant class).

15. In arriving at the amount of overcharges which the court finds to be arbitrary, unreasonable, and unjustly discriminatory, the court finds as most reliable and, therefore, follows the Water Rate Analysis (Defendant's Exhibit 24) presented by the city's expert at the last two days of hearings, which was virtually accepted by the plaintiffs then and at final argument, with certain items found to be unsupported by the law or evidence wholly or partially excluded. These items are as follows:

*Six per cent administrative cost expense —*

This charge was not reflected in the financial records of the city for the years in question. In addition, the selection of the six per cent figure was wholly arbitrary and was not supported by any evidence in the record. Beyond that, there were revenues to which such a charge was applicable which were excluded from the computations and which were sufficient in amount and source to offset any such accounting "expense."

*Debt coverage —*

The court has concluded that it must allow the computation for depreciation, since even if it is stricken it must be added back in for debt service. Depreciation was not figured on the city books, it is not considered a proper allocation for a municipally-owned utility, and even the city's expert admitted that its inclusion was controversial and unfair because it compounded expenses. However, it does represent an actual cash need of the system for the debt service of principal and interest and is properly includible on that basis. The same rationale does not apply to the debt service figure, which is arrived at by deducting non-operating expense and depreciation from the debt coverage required by the bond covenants. It is admitted that the extra 50% coverage is surplus and need not remain within the system. Including it allows a surplus on a surplus. In addition, there is factual support for excluding it, since

during the years in question the city transferred to the general fund, after all expenses and debt service, 35% of gross revenues. The actual surplus earned more than justifies this exclusion, as does the percentage of such surplus attributable to the plaintiff class.

*Payment in lieu of taxes —*

There is no factual support in the record for this alleged expense, nor is it recognized as a proper allocation by the greater weight of American legal authority. In addition, it is a bookkeeping entry and not a cash need, and is wholly inconsistent with the city's theory of municipally-owned utility accounting and rate structuring. If the system were operating at a marginal surplus, the argument in its favor might carry more weight, but in the Pompano Beach system its inclusion would again only be adding more surplus to surplus.

16. After making these deductions or exclusions, the court has then equalized the rates between the plaintiff class and defendant class, in the same manner as the city's expert did. Thus, the plaintiffs' straight line system value is multiplied by the defendant straight line rate of return and the result subtracted from the recomputed straight line line surplus to arrive at the excess charge in each year. The amounts of annual overcharges as so equalized and computed by the court are set forth in the following findings.

### Findings of fact

A. The defendant, city of Pompano Beach, a duly created municipal corporation of the state of Florida, during the years 1965, 1966, 1967, 1968, 1969 and 1970, owned and operated a municipal waterworks which supplied the only source of potable fresh water to the inhabitants and other consumers of the city and to the complaining class of consumers located outside the corporate limits of the city.

B. The plaintiffs represented by this class suit approximate 2,500 in number, were located outside the corporate limits of the city, and, as consumers of the defendant's waterworks system, paid increased water charges during the years in question.

C. Prior to October 1, 1965, pursuant to the provisions of Section 49.07 of the Code of Ordinances of the defendant city of Pompano Beach, the rates charged for water consumed within the corporate limits of the city were $1.50 minimum charge with 3,000 gallons' consumption, and excess gallonage was charged at the rate of 21c per 1,000 gallons; the rates charged for water consumed outside the corporate limits of the defendant city were $2.25 minimum charge with 3,000 gallons' consumption, and.

excess gallonage was charged at the rate of 32c per 1,000 gallons. As thus constituted, the rate for water sold to the plaintiffs as consumers outside the corporate limits of the defendant city exceeded by 50% those rates charged to the residents of the defendant city.

D. By the adoption of Ordinance No. 65-71, effective October 1, 1965, the city commission of the defendant city of Pompano Beach doubled the water rates levied against the complaining outside consumers, to the extent that the rates charged to and paid by the plaintiff class of consumers were thereby increased to $3 minimum charge with 3,000 gallons' consumption, and excess gallonage was billed at the rate of 42¢ per 1,000 gallons, while the rates charged to the inside-city consumers remained the same as before.

E. Thereafter, by the adoption of Ordinance No. 68-59, effective September 9, 1968, the city commission of the city of Pompano Beach again increased the rates for water charged to and paid by the plaintiff class of consumers, the new rate being $3.60 minimum charge up to 3,000 gallons of consumption, and excess gallonage was charged at the rate of 52¢ per 1,000 gallons. By this same ordinance the rates charged to and paid by the inside-city consumers were increased to $1.80 minimum charge with 3,000 gallons' consumption, and excess gallonage was charged at the rate of 26¢ per 1,000 gallons. As constituted by this ordinance, the rates for water sold to the plaintiffs as consumers outside the corporate limits of the defendant city exceed by 100% those rates charged to the residents of the defendant city.

F. The matters raised by the complaints herein are of common or general interest to all of the plaintiffs outside of the corporate limits of the defendant city who constitute a class so numerous as to make it impracticable to bring them all before the court.

G. The water charges paid by the plaintiff class after the adoption of the challenged ordinances, to the extent that these charges exceeded those levied against the inside-city consumers, were paid by the plaintiff class to the defendant city under protest.

H. Within the guidelines set down in *Clay Utility Company v. City of Jacksonville,* 227 So.2d 516 (Fla. 1st DCA 1969), the plaintiffs successfully have met their burden of establishing by competent evidence that the disparity in rates charged to those inside the city and those outside cannot be justified on the basis of the cost of furnishing water to the two different classifications of consumers.

I. For the 1966 fiscal year of the defendant city of Pompano Beach, commencing October 1, 1965, the water charges exacted from the plaintiffs were discriminatory, unreasonable and excessively high in the amount of $69,581.14.

J. For the 1967 fiscal year of the defendant city of Pompano Beach, commencing October 1,1966, the water charges exacted from the plaintiffs were discriminatory, unreasonable and excessively high in the amount of $55,111.89.

K. For the 1968 fiscal year of the defendant city of Pompano Beach, commencing October 1, 1967, the water charges exacted from the plaintiffs were discriminatory, unreasonable, and excessively high in the amount of $53,305.35.

L. For the 1969 fiscal year of the defendant city of Pompano Beach, commencing October 1, 1968, the water charges exacted from the plaintiffs were discriminatory, unreasonable, and excessively high in the amount of $80,830.04.

M. For the 1970 fiscal year of the defendant city of Pompano Beach, commencing October 1, 1969, and ending September 30, 1970, water charges exacted from the plaintiffs were discriminatory, unreasonable, and excessively high in the amount of $79,454.68.

The court makes the following —

### Conclusions of law

N. In the operation of its municipally-owned waterworks the defendant city of Pompano Beach is under a common law obligation to supply water to all its consumers at just and reasonable rates and without discrimination.

O. By its adoption and enforcement of its Ordinances 65-71 and 68-59, effective October 1, 1965, and September 9, 1968, respectively, increasing the water rates for the plaintiff class of outside-city consumers, the defendant city of Pompano Beach effected an arbitrary and capricious deprivation of the property of the plaintiffs without due process of law, resulting in unconstitutional discrimination against the plaintiffs, individually and as a class, and the increased charges as to them were unreasonable, arbitrary, and inequitable.

P. Implicit in the franchise granted by the state of Florida to operate its waterworks facility as a sanctioned monopoly, as contained in the charter of the city, is the strict obligation on the part of the city to operate its monopoly to the extent that it will be beneficial, rather than prejudicial, to the welfare of the public or a large portion thereof.

Q. By the establishment and collection of discriminatory, unreasonable, and excessively high rates for water consumed by the

plaintiff class, as compared to those rates charged to inside-city consumers, the defendant city operated its monopoly in a form and manner which is odious, intolerable, and contrary to public policy and common right, and hence illegal.

R. Ordinance 65-71 and Ordinance 68-59 of the defendant city of Pompano Beach, to the extent that these ordinances imposed upon the plaintiffs discriminatory, unreasonable, and excessively high rates for water consumed by out-of-city consumers, are illegal, unconstitutional, null, void, and of no effect.

17. The court has conducted hearings on the motions of the plaintiffs to tax costs and to award attorney's fees, and to consider the method of making refund of the net overcharges to the plaintiff class. Evidence was received from the expert witness who testified for the plaintiffs, relative to the nature and extent of his services rendered, and he is allowed $12,500 for his services. Evidence also was received on the subject of award of attorney's fees, and the attorneys for the plaintiffs are awarded a fee equal to 40% of the total fund created. The lawyer who testified on their behalf on the matter of the reasonableness of the fees is allowed the sum of $187.50 for his services. In addition, the plaintiffs are allowed the sum of $723.40 for their proven miscellaneous costs.

18. The plaintiffs have submitted to the court a plan of refund, and a hearing was conducted with respect thereto. The court now is advised that only nine meter books — out of all the city's records pertaining to the meter readings, summary sheets, and payment of water charges by the plaintiff class during the five years in issue — can be located by the defendant city. While the burden may have rested with the plaintiffs to secure an order of preservation of these voluminous records, it is nonetheless unthinkable that the city would destroy them until the conclusion of this litigation. Absent such records, and being without counter-proposals by the city, the plan of refund proposed by the plaintiffs is hereby adopted, and a copy of the plan is appended hereto and incorporated herein. This plan satisfies the court as being fair, just, and workable, and it seems reasonably calculated to achieve the refunds desired to the greatest extent possible. At the time for the implementation of the plan, the court will entertain an application from the plaintiffs, with notice to the city, for the appointment of a trustee or trustees to administer the payment of the claims presented.

Upon the foregoing findings of fact and conclusions of law, it is ordered and adjudged that the city of Pompano Beach shall refund to the members of the plaintiff class the amount of overcharges aforesaid, in the total sum of $338,282.10, together with interest

computed* on such overcharges at the legal rate to the date of this final judgment in the sum of $189,754.23, making a total fund of $528,036.33; and further shall pay the plaintiffs' fees and costs, as itemized above, in the total of $13,410.90, resulting in a total judgment of $541,447.23, for all of which let execution issue.

---

\* Interest is computed on the basis that one-twelfth of the excess rate for the Fiscal Year 1966 was charged to the Plaintiff class each month commencing October 1, 1965; that payment of the water bill including such overcharge was due and paid under protest one month after the service was provided; and that interest runs at the rate of 6% per annum from the date of the payment of the overcharge by the Plaintiff class. Thus, interest on each one-twelfth of the overcharge starts to run two months after the first day of the month in which the overcharge was included; i.e., service for the period from October 1, 1965, through October 31, 1965, was due and paid by the Plaintiff class November 30, 1965; and interest starts to run on the overpayment December 1, 1965. On this basis, 10 months' interest is due on the first one-twelfth of the overcharge for Fiscal Year 1966 through September 30, 1966; 9 months' interest is due on the second one-twelfth of the overcharge through September 30, 1966; 8 months' interest is due on the third one-twelfth of the overcharge, etc. After September 30, 1966, interest on the overcharge for Fiscal Year 1966 is computed on an annual basis at 6% per annum for each year and fraction thereof for the period October 1, 1966, to the date of this Final Judgment. Interest on the overcharges in each subsequent Fiscal Year is computed on the same basis.