SALTER, J.
 

 Leonardo Ramos appeals a final summary judgment in favor of Florida Power & Light (FPL) regarding his second
 
 *92
 
 amended complaint for gross negligence. Ramos alleged that FPL was grossly negligent when it terminated electrical service to his farm and family residence, and that the wrongful power cutoff resulted in substantial losses to his ornamental plant crops and livestock. FPL maintained that it had already prevailed on a critical element of Ramos’ claim — the question of whether Ramos engaged in meter tampering and electric current diversion — in a prior administrative proceeding before the Florida Public Service Commission (PSC), with the result that Ramos was precluded as a matter of law from establishing his claim in the later circuit court case. The circuit court agreed with that analysis and entered the final summary judgment in favor of FPL.
 

 We reverse, finding that the PSC’s limited authority to conduct administrative fact-finding regarding billing disputes and rates for electric power does not preclude a trial court’s adjudication of a gross negligence claim for compensatory damages based on the totality of FPL’s conduct regarding its customer. In particular, the PSC’s administrative determination that FPL’s written report provided “sufficient evidence of an unauthorized meter and meter tampering at Mr. Ramos’ address” — a conclusion based on nothing but hearsay presented to the PSC, and vigorously disputed by Ramos (then a self-represented party with no legal training)— does not bar the adjudication of that question in a later court proceeding.
 

 The Farm and the Meters
 

 During the period 1989-97, Ramos used electrical power supplied by FPL to operate his family farm. FPL alleges, but Ramos has denied, that from 1993 to 1997, FPL removed six different unauthorized meters from Ramos’ farm. When a billing and meter-related dispute arose in 1997, FPL could not produce (a) those allegedly-unauthorized meters or (b) any prior written notices to Ramos that his meters were unauthorized or had been tampered with.
 

 In April 1997, an FPL meter reader discovered what he believed to be an unauthorized meter number at Ramos’ property. He also noted that the outer seal on the meter was missing, but he did not determine whether the inner seal was missing. FPL’s “revenue protection department” investigated the matter and concluded that the meter had been switched several times over the last five years.
 

 A meter specialist then visited the property in May 2007 to remove the recently-discovered and allegedly-unauthorized meter for further testing. During this visit, however, yet another meter number was found at the property, and this one was reportedly missing the outer and inner seals. This meter was tested at FPL’s meter test center and was allegedly a “foreign” meter with evidence of meter tampering. FPL then reviewed Ramos’ billing history and allegedly found significantly less usage during the period of the allegedly-unauthorized meters. Thereafter, and applying the methodology specified in its official tariff, FPL billed Ramos approximately $17,800 for allegedly-unauthorized use of electricity over the preceding five and one-half years.
 

 Ramos received a back bill for this amount in July 1997. FPL and Ramos made various offers and counter-offers on settling the alleged backcharges but were unable to reach agreement. In November 1997, FPL disconnected electrical service to Ramos’ property. The following month, Ramos filed a complaint with the PSC alleging unfair baekbilling for meter tampering and disputing FPL’s allegations that Ramos had used an unauthorized meter.
 

 
 *93
 
 Although the PSC received FPL’s written report regarding those issues, it did not conduct an evidentiary hearing. The PSC determined, however, that “because of the particular circumstances of this case, we believe that the fair and reasonable amount of backbilling is $1,386.82.” The PSC’s order also stated “FPL has indicated that it agrees with this amount.”
 

 The order detailed FPL’s difficulties in substantiating its allegations of multiple unauthorized meters and tampering:
 

 Between September 13, 1993 and January 9, 1997 six different meters have been identified at this address. At no time during this period did FPL initiate a current diversion investigation. When Commission staff asked FPL to explain why it had not acted when each of the six different meters were discovered, it responded that the company was going through a period of reorganization and the policy in place at the time called for the meter reader to input whatever meter was found at an address as the new meter of record if there were no obvious signs of meter tampering. The Company further stated that after 1995 their procedures were modified to minimize this type of problem. Even though FPL indicated that their procedures changed after 1995, the same problem occurred on January 9, 1997, when the sixth foreign meter was found and FPL again entered it as a new meter set and meter of record. We believe FPL failed to provide adequate proof of meter tampering prior to January 9, 1997. FPL had ample opportunity to notice any alleged meter tampering when six new meters were recorded on the customer’s account in a four year time period. We find it problematic that so many unauthorized meter changes did not trigger an investigation on FPL’s part. However,
 
 FPL did not test, nor was it able to locate, any of the six meters in question.
 

 [1]
 

 In 2000, Ramos commenced a circuit court lawsuit against FPL alleging that the termination of power to his home and farm was grossly negligent, and that he suffered a foreclosure of the property, loss of crops, and other compensatory damages as a result. After pretrial discovery and two amendments to the complaint, FPL’s motion for final summary judgment was heard and granted.
 

 The PSC, the Rules, and the Tariff
 

 Section 366.04, Florida Statutes (1997), grants to the PSC jurisdiction “to regulate and supervise each public utility with respect to its rates and service....” Section 366.05(1) grants to the PSC “power to prescribe fair and reasonable rates and charges, classifications, standards of quality and measurements, and service rules and regulations to be observed by each public utility,” and further authorizes the PSC to promulgate rules to implement and enforce these powers. The PSC has promulgated such rules, including a set of rules in Part VI of Chapter 25-6, Florida Administrative Code, “Customer Relations,” that are pertinent to the billing dispute between Ramos and FPL. In addition, FPL and other public utilities promulgate a set of rates, rules, and regulations collectively referred to as a “tariff,” subject to review and approval by the PSC. The FPL Tariff contains several provisions addressing “unauthorized re-metering,” meter tampering, billing disputes, and discontinuance of service.
 

 Exclusive PSC Jurisdiction and the “Nature of the Relief Sought”
 

 Citing
 
 Storey v. Mayo,
 
 217 So.2d 304 (Fla.1968), and
 
 Richter v. Florida Power Corp.,
 
 366 So.2d 798 (Fla. 2d DCA 1979),
 
 *94
 
 FPL argues that the PSC’s regulations and fact-finding powers regarding its dispute with Ramos are exclusive, and that PSC’s resolution of the “consumer dispute” with Ramos in 1998 were thus preclusive, binding, and final. This Court has followed that reasoning when a consumer’s circuit court lawsuit required the court to determine whether the consumer “was properly charged for its electricity consumption,” holding that such a determination is exclusively within the jurisdiction of the PSC.
 
 Fla. Power & Light Co. v. Albert Litter Studios, Inc.,
 
 896 So.2d 891, 894 (Fla. 3d DCA2005).
 

 In
 
 Albert Litter Studios,
 
 we held that “[i]n order to resolve the jurisdictional issue, we must first look to the nature of the relief sought by the plaintiff because it is the
 
 nature of the relief sought,
 
 not the language of the complaint, that ultimately determines which tribunal has jurisdiction over the claim.”
 
 Id.,
 
 896 So.2d at 893. The nature of the relief sought by Ramos is those consequential damages that allegedly flowed from a grossly negligent claim of meter tampering and electrical cutoff, not merely a dispute about the charges for electricity. Although FPL maintains that the “customer complaints” sections of the Florida Administrative Code and the FPL Tariff provided Ramos with “available and adequate remedies,” we disagree.
 

 Chapter 366, the Florida Administrative Code, and the FPL Tariff do not specify that the PSC has exclusive jurisdiction to conduct evidentiary hearings or other tests on meters to find, as a matter of fact, that a meter has been improperly replaced, tampered with, or altered for the purpose of .stealing electrical power.
 
 [2]
 
 Nor ' does that regulatory scheme authorize the PSC to award compensatory damages (as opposed to a credit for an unfounded charge on a monthly bill) if the utility’s claim is disproven and FPL’s cutoff to the property is thus shown to have been improper.
 

 This case involves serious allegations, substantial resulting losses, and conceded error by FPL regarding the care, custody, and testing of the allegedly-tampered meters. FPL’s computation of backcharges was reduced by over 92% by the PSC, but that is not the critical factual issue in Ramos’ second amended complaint. The controlling questions are whether FPL’s claims of meter tampering can be proven by competent substantial evidence — not by an unauthenticated, hearsay report — and whether FPL’s disconnection of electrical power to the Ramos’ residence and farm was based on facts rather than allegations.
 

 Regarding those factual determinations outside the sphere of exclusive PSC jurisdiction, Ramos had no obligation to seek judicial review or exhaust all remedies relating to the PSC’s October 1998 order: “[T]he doctrine of exhaustion of administrative remedies is not applicable in this situation; in any event, it is clear that pursuit of an administrative remedy by [plaintiff] would be to no avail, since the PSC does not have any authority to award money damages.... ”
 
 S. Bell Tel. & Tel. Co. v. Mobile Am. Corp., Inc.,
 
 291 So.2d 199, 201 (Fla.1974).
 

 The Economic Loss Rule
 

 FPL also argues that the economic loss rule bars Ramos’ claims, citing such cases as
 
 Florida Power & Light Co. v. Westinghouse Electric Corp.,
 
 510 So.2d 899 (Fla.1987), and
 
 Casa Clara Condominium Ass’n, Inc. v. Charley Toppino & Sons, Inc.,
 
 620 So.2d 1244 (Fla.1993). In this case, however, Ramos’ claims specifically involve alleged acts and property damages that are “independent of any contractual breach.”
 
 Am. Express Travel Related Servs. Co., Inc. v. Symbiont Software
 
 
 *95
 

 Group, Inc.,
 
 837 So.2d 434, 435 (Fla. 3d DCA 2002),
 
 review denied,
 
 851 So.2d 729 (Fla.2003). The harm claimed by Ramos is “above and beyond disappointed expectations” or the “benefit of the bargain” based on the FPL Tariff.
 
 Casa Clara Condo. Ass’n,
 
 620 So.2d at 1246. Such tort claims are a recognized exception to the economic loss rule.
 
 Indem. Ins. Co. of N. Am. v. Am. Aviation, Inc.,
 
 891 So.2d 532, 537 (Fla.2004).
 

 Conclusion
 

 Based on the second amended complaint and the pretrial discovery submitted in opposition to FPL’s motion for summary judgment, this case is not a routine consumer billing dispute falling fairly within the FPL Tariff and subject to the exclusive jurisdiction of the PSC. Because genuine issues of material fact exist and FPL is not entitled to judgment as a matter of law, the final summary judgment is reversed. This case is remanded to the trial court for further proceedings consistent with this opinion.
 

 Reversed and remanded.
 

 [1]
 

 .
 
 In Re: Complaint by Ramos,
 
 98 FPSC 10:464 (1998) (emphasis supplied).
 

 [2]
 

 . Such allegations, investigations, and conclusions by FPL may also culminate in criminal charges;
 
 see
 
 section 812.14, Florida Statutes (2009).