[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 373 
The opinion of December 11, 1998, is withdrawn and the following is substituted therefor.
These appeals concern the constitutionality of Act No. 85-645, 1985 Ala. Acts, p. *Page 374 
983, which is intended to prevent the unnecessary duplication of facilities that supply "retail electric service" across the State of Alabama. Various municipalities that provide retail electric service, and certain individual and commercial consumers, challenged Act No. 85-645 on numerous constitutional grounds. The trial court held, among other things, that Act No. 85-645: (1) violates the substantive-due-process rights of certain "electric suppliers" and consumers; (2) is a local law and does not comply with the notice requirements for a local law; (3) grants special privileges to private corporations; (4) suspends the operation of the general law for the benefit of private corporations; (5) contains a vague and ambiguous section that incorporates private agreements; and (6) usurps the judicial function of setting the amount of compensation for takings. The plaintiffs named as defendants "the citizens of the State of Alabama"; the trial court refused to dismiss the citizens of the State of Alabama from the actions and also refused to dismiss certain named electric suppliers from the actions. Because we hold that Act No. 85-645 constitutes a valid exercise of the Legislature's power to enact economic regulatory statutes; that the trial court erred in refusing to dismiss the disinterested citizens of the state; and that the trial court correctly refused to dismiss the named electric suppliers, we affirm in part, reverse in part, and remand.
 I. Historical Background
The electric-utility industry has a long history in this state. Electric suppliers have made large investments of capital to build generating facilities (e.g., hydroelectric dams and nuclear plants) and distribution facilities (e.g., power lines and transformer stations) that supply electricity to individual, commercial, and governmental consumers.
Because of the large investment required to construct and maintain electric-generation and -distribution facilities and the potential for wasteful duplication of such facilities, the Alabama Legislature enacted statutes that limited duplication by restricting competition while protecting consumers by regulating the prices charged for electric service. See, e.g., Act No. 37, Ala. Acts 1920, p. 38 (providing that no facility for the production or transmission of electricity shall be constructed without a certificate of convenience and necessity and providing that rates for utility services shall provide a fair net return on the reasonable value of property devoted to public service).
For many years, the Alabama Legislature delegated the function of regulating the electric industry to the Alabama Public Service Commission (the "PSC"). See, e.g., Ala. Code 1886, § 1120 (establishing the PSC); Ala. Code 1923, §§ 9661, 9771, 9813, 9621 (authorizing the PSC to promulgate regulations and to set utility rates). Although the PSC has long had the authority to regulate public-utility companies, such as Alabama Power Company ("APCo"), it has had a more limited authority to regulate other types of electric suppliers. See, e.g., Ala. Code 1975, § 37-6-27
(exempting electric cooperatives from the jurisdiction of the PSC); § 37-1-34 (exempting utilities owned and operated by municipalities from PSC jurisdiction); § 37-1-43 (exempting utilities regulated by Congress, such as the Tennessee Valley Authority, from PSC jurisdiction). In special situations where the PSC determined that private territorial agreements would eliminate competition and the resulting duplication of facilities, it approved private territorial agreements between a public-utility company on the one hand and a cooperative, a municipal electric supplier, or another public-utility company on the other. See, e.g., In re Birmingham Elec. Co. Alabama PowerCo., APSC Docket No. 4729, 36 APSC 367 (1925) (approving a territorial agreement between two public utilities); In re AlabamaPower Co., Order of the Commission, APSC Docket No. U2539 (Dec. 28, 1973) (approving a territorial agreement between public-utility and *Page 375 
an electric cooperative); In re Alabama PowerCo., Order of the Commission, APSC docket No. 16517 (Feb. 22, 1972) (approving a territorial agreement between public-utility and municipality). There existed, however, no comprehensive regulatory system to prevent duplication of facilities for all types of electric suppliers.
Under the noncomprehensive regulatory system, four main types of retail electric suppliers became established in Alabama. The Tennessee Valley Authority (the "TVA") provides retail electric service in the northern part of the state. Approximately 22 electric cooperatives (the "Co-ops") supply retail electric service to their members, often in rural areas, including the portion of the state serviced by the TVA. Approximately 36 municipalities, or their utility boards, supply retail electric service to residents of those municipalities, and in some instances to nonresidents. Outside the TVA area, APCo supplies retail electric service to those consumers not served by the Co-ops or the municipalities.
In response to what it viewed as the increasing potential for duplication of facilities and costs of electric distribution systems, the Legislature conducted an investigation of the "economic, financial and environmental impact associated with the potential for duplication of electric distribution facilities used for the furnishing of electric retail service." Act No. 85-645, Ala. Acts 1985, § 1. From its investigation, the Legislature concluded:
 "[W]ith respect to retail electric sales, the benefit normally associated with competition between two or more entities for customers is outweighed by the tremendous cost burden which must be borne by such customers associated with the maintenance of two or more duplicate sets of facilities. It is the further finding of the Legislature that the existence of duplicate facilities for the furnishing of electricity at retail is not in the public interest because of the adverse impact which such duplication has on environmental and aesthetic values and on safety. It is therefore declared that the policy of the State of Alabama is to ensure effective, economical and orderly supply of electric service at retail to customers in the State and to avoid unnecessary duplication of facilities by electric suppliers for the furnishing of such services which would result in waste and in degradation of the environment. To accomplish these objectives, it is necessary and in the public interest to establish, mandate and implement procedures for determining which electric supplier shall furnish electric service to customers at retail within various areas of the State including areas within the corporate limits of municipalities in the State."
Id. at § 1.
To implement its policy decision to prevent wasteful duplication of electric facilities across the state, the Legislature devised the comprehensive regulatory plan embodied in Act No. 85-645 (the "Act")[1] to assign service territories to retail electric suppliers. The Act separates service territories into three categories: (1) territories outside municipal limits; (2) territories inside municipal limits; and (3) special territories. Section 3 of the Act addresses the potential for duplication of electric distribution facilities outside the corporate limits of municipalities. For such areas, retail electric service will be provided to a customer by the supplier whose distribution lines are closer to that customer. Act No. 85-645, § 3(a). However, non-municipal suppliers may compete to provide retail electric service to large new industrial customers without regard to the "closer to" rule. Id. at § 3(b).
Section 4 of the Act addresses the potential for duplication of electric facilities inside the corporate limits of municipalities. Where two or more suppliers deliver retail electric service within a municipality, *Page 376 
the Act grants the primary supplier the option to purchase the distribution facilities of a secondary supplier. Act No. 85-645, § 4(a). Under the "option" rule, the option price is the value of the distribution facilities computed at replacement cost, plus two and one-half times the last year's gross revenue, plus certain other adjustments. Id. To the extent a primary supplier elects not to exercise the purchase option, the "closer to" rule applies inside municipal limits. Id.
at § 4(a)(5). In general, municipal suppliers may not extend retail electric service to customers outside their municipal limits as those limits existed on April 26, 1984. Id. at §§ 3(c), 2(h). In addition to providing for the assignment of service territories by the "closer to" rule for areas outside municipal limits and by the "option" rule for areas inside municipal limits, the Act, in § 7, continues the PSC's prior practice of assigning service territories for particular geographic areas in accordance with agreements between electric suppliers. The Legislature reviewed a number of agreements between electric suppliers and determined that certain of them satisfactorily resolved the duplication problems for the particular geographic areas they covered. Act No. 85-645, § 7. Section 7 incorporates those agreements approved by the Legislature (the "Nonduplication Agreements") by reference and finds that the agreements serve the public interest in a manner consistent with the purposes of the Act with respect to the particular geographic areas to which they apply. Id.
 II. Procedural Background
In 1986, the Co-ops filed this declaratory-judgment action to test the validity of the comprehensive regulatory system provided by the Act. The Co-ops and APCo (collectively, the "Proponents") contended the Act was valid. The municipal electric suppliers, certain private businesses, and certain individuals (collectively, the "Opponents") contended the Act was not valid. The trial court initially held that the Act violated § 220 of the Constitution of Alabama of 1901 by depriving municipalities of the right to consent to the use of streets and rights-of-way by public utilities. This Court reversed that judgment and remanded the case. Alabama Power Co. v. Citizens of the State of Alabama,527 So.2d 678 (Ala. 1988).[2]
The trial court tried the case on remand in 1990. In March 1997, it rendered a declaratory judgment holding the Act unconstitutional on several grounds. First, the trial court concluded that the Act violated the substantive-due-process rights of the Opponents under §§ 6 and 13 of the Constitution of Alabama of 1901 by imposing regulatory means that were not sufficiently related to the ends stated by the Legislature. Second, the trial court held that the Act's incorporation of the Nonduplication Agreements amounted to the enactment of local laws without the local notice required by § 106 of the Alabama Constitution. Third, the trial court held that the Act violated § 108 of the Alabama Constitution (providing that the "operation of a law shall not be suspended for the benefit of" private companies) by including special provisions under which private electric suppliers were not covered by the "closer to" rule or the "option" rule if they *Page 377 
became parties to a Nonduplication Agreement or if they competed for certain large new industrial customers. Fourth, the trial court held that the Act violated § 22 of the Alabama Constitution (prohibiting the grant of exclusive privileges to private companies) by assigning service territories to suppliers. Fifth, the trial court held that because the Act omits the text of the § 7 Nonduplication Agreements, it was vague and ambiguous and thus violated, among other things, the Fourteenth Amendment of the Constitution of the United States and §§ 6 and 13 of the Alabama Constitution. Sixth, the trial court held that the portion of the Act setting the option price for the purchase of secondary distribution systems within a municipality violated theFifth Amendment of the Constitution of the United States and § 235 of the Alabama Constitution because, by that portion of the Act, the Legislature set the amount of "just compensation," instead of allowing the judiciary to do so. The Proponents appealed, challenging each of the six holdings set out above.
Further, the trial court refused to dismiss as parties the citizens of the State of Alabama and certain named suppliers. The Opponents appeal this ruling.
 III. Constitutional Issues
In addressing the alleged constitutional infirmities of the Act, we are conscious of the well-established rule requiring courts to defer to the policy-making authority of the Legislature by rejecting constitutional challenges to statutes, where it is possible to do so. In Alabama State Federation of Labor v.McAdory, 246 Ala. 1, 9-10, 18 So.2d 810, 814-15 (1944), cert. dismissed, 325 U.S. 450 (1945), this Court stated:
 "Uniformly, the courts recognize that [the] power [to strike down a statute as unconstitutional] is a delicate one, and to be used with great caution. . . . It follows that, in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law. . . .
 "Another principle which is recognized with practical unanimity, and leading to the same end, is that the courts do not hold statutes invalid because they think there are elements therein which are violative of natural justice or in conflict with the court's notions of natural, social, or political rights of the citizen, not guaranteed by the constitution itself. Nor even if the courts think the act is harsh or in some degree unfair, and presents chances of abuse, or is of doubtful propriety. All of these questions of propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decide is one of power, not of expediency or wisdom."
(Emphasis added.) (Citations omitted.)
 A. Substantive Due Process
The trial court held that the Act violated the substantive-due-process rights of the Opponents guaranteed under the Constitution of Alabama of 1901 because, it concluded, the comprehensive means adopted by the Legislature were not sufficiently related to the legitimate ends of reducing the duplication of costs. On appeal, the Proponents contend that the Act's regulatory provisions are reasonably related to the legitimate purposes of eliminating the economic, environmental, aesthetic, and safety costs inherent in the duplication of retail-electric-distribution facilities. The Opponents argue that the problems of *Page 378 
duplication are, at best, minimal, and that the Act's comprehensive response to duplication problems is unreasonable.
Both the Constitution of the United States and the Constitution of Alabama of 1901 guaranty "due process of law." U.S. Const. amends. V; XIV, § 1; Ala. Const. 1901, §§ 6 and13.[3] In addition to the procedural protections provided by the Due Process Clause (for example, notice, a hearing, and a neutral magistrate), see, e.g., Mathews v. Eldridge, 424 U.S. 319
(1976), courts have held that the Clause provides certain substantive protections, see, e.g., Adkins v. Children's Hospital,261 U.S. 525 (1923). Although the Supreme Court of the United States has applied differing standards of substantive-due-process review to economic legislation, the most famous example of the Supreme Court's activist[4] use of substantive due process isLochner v. New York, 198 U.S. 45 (1905). In Lochner, id., at 57, the Supreme Court struck down a state law limiting the number of hours per week bakers could work. The majority reasoned that the law interfered with an implicit liberty to contract encompassed by the Due Process Clause and failed to accomplish a legitimate purpose in a sufficiently direct manner. Id. at 57-58. The majority then stated that to constitute a valid exercise of the police power, an "act must have a more direct relation, as a means to an end, and the end itself must be appropriate and legitimate."Id. Justice Holmes dissented from the majority's nondeferential standard, explaining:
 "The Fourteenth Amendment does not enact Mr. Herbert Spencer's Social Statics.[5] . . . Some [statutes] embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular economic theory, whether of *Page 379 
paternalism and the organic relation of the citizen to the State or of laissez faire. It is made for people of fundamentally differing views. . . ."
Id. at 75-76 (Holmes, J., dissenting) (citations omitted). The words "due process of law" offered no standard by which the Justices could evaluate economic legislation; thus, the majority had imposed its own economic philosophy onto the Constitution. Accord Morehead v. New York ex rel. Tipaldo, 298 U.S. 587 (1936) (striking down state minimum-wage law for women on substantive-due-process grounds).
In Lochner and its progeny, the activist reevaluation of economic legislation based on the nontextual, political views of the Justices transformed the Supreme Court from a judicial tribunal into a "superlegislature" and transformed the Justices from Article III judges into Platonic Guardians. See Ferguson v.Skrupa, 372 U.S. 726, 731-32 (1963) (reflecting on substantive due process and its transformation of the Supreme Court into a "superlegislature"); Learned Hand, The Bill of Rights 73 (Harvard Univ. Press 1958) (referring to Justices who substituted their personal views of particular laws for the view of the legislature as "Platonic Guardians").
The political struggle between the Supreme Court on the one hand, and Congress and the Executive on the other, ultimately convinced the Supreme Court to extricate itself from the legislative function of reviewing the substance of economic regulation. See John E. Nowak Ronald D. Rotunda, ConstitutionalLaw 362-80 (4th ed. 1991). In West Coast Hotel Co. v. Parrish,300 U.S. 379 (1937), the Supreme Court finally abandoned substantive-due-process review of economic legislation and upheld a minimum-wage statute that was neither arbitrary nor capricious. The next year, in United States v. Carolene Products Co.,304 U.S. 144, 154 (1938), the Supreme Court made its rejection of substantive-due-process review of economic regulation emphatic by replacing the ambiguous means-end relation test with a clear, deferential standard for the assessment of economic legislation. The Supreme Court stated:
 "[T]he existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators."
Id. at 152. Thus, "where the legislative judgment is drawn in question, [a court's inquiry] must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for [the economic regulation]." Id. at 154. Accord Williamson v. Lee Optical Co. of Oklahoma, Inc.,348 U.S. 483, 491 (1955) (exhibiting a willingness to conceive of possible rational bases for a statute).[6] Justice Holmes's dissent in *Page 380 Lochner had become the law.[7]
While this Court has not engaged in a campaign to strike down economic legislation, it has applied some of the less activist substantive-due-process formulations previously employed by the Supreme Court of the United States. For example, in Franklin v.State ex rel. Alabama State Milk Control Bd., 232 Ala. 637,642-44, 169 So. 295, 299-300 (1936), this Court acknowledged the Supreme Court's pre-Lochner "affected-with-the-public-interest" test in upholding a statute regulating the production of milk. (Citing Munn v. Illinois, 94 U.S. (4 Otto) 113, 130 (1876) (holding that a state law regulating rates charged by grain elevators did not violate the elevator operators' substantive-due-process rights because the statute was "affected with the public interest" and, thus, within the police power of the state)). In McAdory, 246 Ala. at 12, 18 So.2d at 818, this Court quoted the Supreme Court's post-Lochner means-end relation test in upholding certain provisions of a labor statute. (CitingNebbia v. New York, 291 U.S. 502, 525 (1934) (stating that legislation did not impinge on substantive-due-process rights as long as it was not "unreasonable, arbitrary or capricious" and "the means selected [had] a real and substantial relation to the object sought to be attained")).
Since McAdory, 246 Ala. 1, 18 So.2d 810, was decided in 1944, Alabama appellate courts have on several occasions rearticulated the standard for substantive-due-process review of economic legislation. See Estell v. City of Birmingham, 51 Ala. App. 462,286 So.2d 866, 869-870 (embracing a version of the affected-with-the-public-interest test), aff'd, 291 Ala. 680,286 So.2d 872 (1973); Mount Royal Towers, Inc. v. Alabama State Bd.of Health, 388 So.2d 1209, 1214-15 (Ala. 1980) (requiring that the statutory balance struck between individual rights and a demonstrable public interest be "reasonable and fair"); State exrel. Galanos v. Mapco Petroleum, Inc., 519 So.2d 1275, 1284 (Ala. 1987) (stating, with respect to legislation aimed at preventing monopolization, that "the means it employs" must be "reasonably designed to accomplish that end without unduly infringing upon protected rights").
Because this Court's rearticulations of the substantive-due-process test are arguably susceptible to an activist interpretation, the Opponents invite this Court to take advantage of this susceptibility by engaging in aLochner-type review of economic regulatory statutes. Specifically, they would have this Court reevaluate the Legislature's findings of significant costs of duplication and of the sufficiency of the relation between the Act's regulatory provisions and its goals of reducing those costs. We decline to do so. *Page 381 
The lessons of our federal counterpart's activist substantive-due-process experiment are clear. The Constitution of Alabama of 1901 does not vest the Judiciary with the essentially legislative power to reevaluate the broad policy considerations inherent in crafting economic policy. See Ala. Const. 1901, § 43 (commanding that the "judicial [department] shall never exercise the legislative . . . power; . . . to the end that it may be a government of laws and not of men").[8] Nor does the Constitution somehow endow this Court with the wisdom of Platonic Guardians to oversee and second-guess the economic policy decisions of the legislative branch.[9] Instead, our Constitution vests this Court with a limited judicial power that entails the special competence to decide discrete cases and controversies involving particular parties and specific facts. Ala. Const. 1901, amend. 328, § 6.01 (vesting the judicial power in the Unified Judicial System); see, e.g., Copeland v. JeffersonCounty, 284 Ala. 558, 561, 226 So.2d 385, 387 (1969) (stating that courts decide only concrete controversies between adverse parties). In short, this Court has neither the constitutional license nor the institutional competence to substantively reevaluate economic legislation.
Accordingly, we refuse to impose an unrestrainable, extra-constitutional standard onto the words "due process of law," because to do so would inevitably lead us to sit as a "superlegislature" with respect to wholly legislative policy decisions. Therefore, we reject the means-end relationship test of Lochner and its progeny, in favor of the more deferential articulation of the substantive-due-process test enunciated inCarolene Products, 304 U.S. at 152-54. If there is "any state of facts either known or which could reasonably be assumed," that would establish a rational relationship between the economic regulation and a legitimate state interest, we will uphold the statute against a substantive-due-process challenge.
The Act's provision of service territories for retail electric suppliers is rationally related to the Legislature's legitimate concern with preventing the economic, environmental, and safety costs that the Legislature reasonably might determine are inherent in the duplication of electric-distribution facilities.[10] The elaborate *Page 382 
evidentiary arguments of the parties regarding the need for the Act are inapposite.[11]
This Court has long recognized that it is possible for the duplication of electric-generation and electric-distribution facilities to result in increased costs to consumers.[12] SeeEx parte Birmingham, 199 Ala. 9, 19, 74 So. 51, 55 (1917) ("Competition in some circumstances may amount to needless economic waste in the duplication of investments and the cost of operation for which in the end the consuming public must pay.");Alabama Power Co. v. Alabama Pub. Serv. Comm'n, 278 Ala. 597,601-02, 179 So.2d 725, 728 (1965) ("It is not difficult to see that unrestricted duplication of lines would not be in the public interest, or, as stated in the statute, would not be `compatible with the public interest.'") (citation omitted). We conclude that the Act, as a whole, does not infringe the substantive-due-process rights of the Opponents.
 B. General or Local Law
The trial court held that the Act was a local law under § 110 of the Constitution of Alabama of 1901 and was thus invalid because no local notice had been published. The Proponents contend that the Act, when viewed as a whole, is a general law and that § 7 merely *Page 383 
implements the purpose of the Act to eliminate duplication of electric facilities by assigning service territories. The Opponents argue that § 7 is separate and distinct from the balance of the Act and that it exempts 15 localities from the Act's operation, thereby providing 15 "local" laws within the meaning of § 110 of the Constitution of Alabama of 1901.
Section 110 of the Alabama Constitution, as amended by Amend. No. 397, provides in pertinent part:
 "A general law is a law which in its terms and effect applies either to the whole state, or to one or more municipalities of the state less than the whole in a class. A general law applicable to such a class of municipalities shall define the class on the basis of criteria reasonably related to the purpose of the law. . . .
 "No general law which at the time of its enactment applies to only one municipality of the state shall be enacted, unless notice of the intention to apply therefor shall have been given and shown as provided in Section 106[13] of this Constitution for special, private or local laws. . . .
 "A special or private law is one which applies to an individual, association or corporation. A local law is a law which is not a general law or a special or private law."
(Emphasis added.)
This Court has consistently recognized that a statute is a "general law" if, when viewed as a whole, it fulfills its chief purpose with respect to the particular object at which the purpose is directed. See Dillon v. Hamilton, 230 Ala. 310, 313,160 So. 708, 710 (1935) ("[A statute] cannot be divided so that a part will be local and a part general requiring notice as to a part, and none as to the balance."). This Court has stated:
 "To hold that every law enacted as a general one, and which deals with state-wide questions, becomes local, because qualified and limited in some of its details to meet local requirements and conditions, would render it practically impossible to pass general laws . . . and at the same time vary the minor details thereof, so as to meet the exigencies or differences of various localities confronted with different conditions."
State ex rel. Collman v. Pitts, 160 Ala. 133, 143, 49 So. 441, 444
(1908). Further, this Court has stated: "A court is duty bound not to construe the act as a local one when it is so framed as to be reasonably susceptible of interpretation as a general law."Crosslin v. City of Muscle Shoals, 436 So.2d 862, 863 (Ala. 1983) (citation omitted).
In Collman, 160 Ala. 133, 49 So. 441, this Court upheld a statute that prohibited the manufacture and the sale of alcoholic beverages in every county of the state. Although the statute provided exceptions from its prohibition against the sale of alcoholic beverages for localities covered by local acts that in some fashion prohibited such sales, the statute's prohibition against the manufacture of alcohol applied to every county.160 Ala. at 137-38, 49 So. at 442. Because the object of prohibiting the manufacture of alcoholic beverages existed in every county, a chief feature of the act, that is, the prohibition of such manufacture, had to apply to every county in the state for the statute to be a general law. Id. at 142-47, 49 So. at 443-45.
In Crosslin, 436 So.2d at 863-64, this Court upheld a statute that imposed a statewide beer tax on wet counties, and provided separate formulas for the distribution of the tax revenues for certain counties. This Court held the statute was a general law because its chief feature — the imposition of a uniform tax — applied generally. Id. at 864. Although the tax *Page 384 
did not affect every county, it was nonetheless general, because it applied to every county in which the object of the tax — the sale of beer — was present. Accord, e.g., Opinion of the Justices No.349, 665 So.2d 1378, 1379, 1382 (Ala. 1995) (opining that a bill to amend a statute by adding an additional fish habitat to a protected list would be a general law where it was reasonable to conclude that in the Legislature's judgment the amended statute would protect similarly endangered fish habitats in every portion of the state in which there were such endangered habitats); Horganv. Dauphin Island Water Sewer Auth., 409 So.2d 1359 (Ala. 1982) (holding that a statute providing for water, sewer, and fire-protection improvements in resort areas was a general law because it applied to every portion of the state in which a resort area was located).
The main purpose of the Act is to prevent the unnecessary duplication of retail-electric-distribution facilities. The Act accomplishes this purpose in every area of the state in which there is actual or potential duplication. It does so by its chief feature, the assignment of service territories to electric suppliers. If § 7 of the Act and the Nonduplication Agreements were viewed separately from the "closer to" and "option" rules, the "closer" to and "option" rules would nonetheless be general in nature. Because the parties to the Nonduplication Agreements have agreed to an assignment of service territories that eliminates unnecessary duplication within a particular geographic area, the object of the Act to avoid actual or potential duplication is not present in the covered areas. Thus, the "closer to" and "option" rules, even if viewed in isolation, would apply to every area of the state in which there was actual or potential duplication.[14] Collman, 160 Ala. at 142-47,49 So. at 443-45; Crosslin, 436 So.2d at 864.
If, on the other hand, § 7 and the Nonduplication Agreements are properly viewed as an integral part of the Act, then the Nonduplication Agreements serve as one of three means by which the Legislature avoids the unnecessary duplication of electric-service facilities. The chief feature of the Act is the assignment of service territories to electric suppliers. Ala. Act No. 85-645, § 1 ("To accomplish these objectives, it is necessary and in the public interest to establish, mandate and implement procedures fordetermining which electric supplier shall furnish electric serviceto customers at retail within various areas of the State including areas within the corporate limits of municipalities in the State.") (emphasis added). The Act employs three procedures, or means, by which its chief feature is effected: (1) the assignment of service territories outside municipal limits; (2) the assignment of service territories inside municipal limits; and (3) the assignment of service territories pursuant to agreements that sufficiently eliminate duplication in particular geographic areas. Section 7 of the Act *Page 385 
does not exempt specific localities from the chief feature of the Act, the assignment of service territories. Nor does § 7 allow the parties to the Nonduplication Agreements to assign and reassign service territories pursuant to their wishes as embodied in agreements that form no part of the Act. Instead, § 7 of the Act expressly incorporates the assignment of service areas contained in the Nonduplication Agreements, binding the parties to the terms of those agreements by the force of statutory law.[15] Thus, the chief feature of the Act — the assignment of service territories — accomplishes the purpose of the Act — the elimination of actual or potential duplication of electric-service facilities — throughout the state. Collman, 160 Ala. at 142-47,49 So. at 443-45; Crosslin, 436 So.2d at 864. Therefore, we hold that the Act is "so framed as to be reasonably susceptible of interpretation as a general law," for which local notice was not required. Crosslin, 436 So.2d at 863.
 C. Suspension of General Law
The trial court held that § 7 of the Act, which provides for the assignment of electric-service territories in certain geographic areas under the Nonduplication Agreements, suspended the operation of a general law and did so for the benefit of private corporations, and thus violated § 108 of the Constitution of Alabama of 1901. While the Opponents argue that § 7 of the Act suspends the "closer to" and "option" rules, in violation of § 108, the Proponents argue that the Act, viewed as a whole, regulates competition of electric suppliers by assigning service territories, and that one provision of the Act should not be viewed as suspending other provisions designed to accommodate different circumstances.
Section 108 of the Alabama Constitution provides:
 "The operation of a general law shall not be suspended for the benefit of any individual, private corporation, or association; nor shall any individual, private corporation or association be exempted from the operation of any general law except as in this article otherwise provided."
Section 108 prohibits an exemption for a private corporation from a general statute designed to govern a general circumstance. Accordingly, this Court has held that the exemption of one business from the general prohibition of the sale of liquor on Sundays was repugnant to the predecessor of § 108 because the exemption thwarted the general purpose of the regulatory statute.Beauvoir Club v. State, 148 Ala. 643, 651-52, 42 So. 1040, 1043
(1907). Section 7, however, does not suspend the general regulatory plan of the Act so as to allow a private corporation to duplicate costs. Instead, § 7 assures that no actual or potential duplication will arise in the areas covered by the Nonduplication Agreements. Thus, § 7 is not an exemption from the requirement not to duplicate facilities, but an integral part of the Legislature's plan to prevent such duplication. Accordingly, we cannot hold that § 7 of the Act violates § 108 of the Alabama Constitution.
 D. Special Privileges
The trial court held that the Act, which grants a legislative franchise to electric suppliers for the assigned territories they serve,[16] violates § 22 of the *Page 386 
Constitution of Alabama of 1901 by affording private corporations exclusive privileges, or franchises, that are not in the public interest. The Proponents argue that by granting "legislative franchises" the Act assigns service territories for the public purpose of preventing costly duplication of electric-distribution facilities. They further contend that the assigned service territories are revocable under § 22 and thus do not render the Act unconstitutional. The Opponents argue that the Act's assignment of exclusive service territories for private corporations is a clear violation of § 22
of the Alabama Constitution.
Section 22 of the Alabama Constitution prohibits the grant of an irrevocable franchise, by providing in pertinent part:
 "[N]o . . . law . . . making any irrevocable or exclusive grants of special privileges or immunities, shall be passed by the legislature; and every grant or franchise, privilege, or immunity shall forever remain subject to revocation, alteration, or amendment."[17]
(Emphasis added.) For almost a century this Court has recognized that while § 22 does prohibit the grant of an irrevocable franchise, it does not prohibit the grant of a revocable "special exclusive privilege . . . awarded . . . for the convenience and benefit of the public," and it has stated, "If this doctrine be not correct, then the State can make no contract for . . . any . . . work of [a] public-utility. . . ." Dickinson v. Cunningham,140 Ala. 527, 543-44, 37 So. 345, 349 (1904). While every grant of a certificate of need or franchise to a public-utility, or a similar business, is "exclusive" to some degree, such a legislative grant is not impermissibly exclusive under § 22 because the Legislature is free to include other service providers in a given service area, thereby revoking the exclusivity, or monopoly, feature of the grant:
 "`While [the Legislature] may grant special privileges and immunities to build . . . works of public-utility, and by a failure to duplicate a grant make it in effect for the time being exclusive, yet no Legislature can forestall action by a succeeding Legislature, or bind the state by making the grant in terms exclusive. . . . [E]ven if exclusive privileges were granted, the monopoly feature thereof should always be subject to revocation.'"
Town of New Decatur v. American Tel. Tel. Co., 176 Ala. 492,552-53, 58 So. 613, 632 (1912) (Sayre, J., concurring) (interpreting the predecessor of § 22 and quoting Bienville WaterSupply Co. v. City of Mobile, 186 U.S. 212, 223 (1902)). This Court has recognized that § 22's mandate that any franchise be subject to revocation is incorporated into statutes and ordinances by operation of law. Town of New Decatur, 176 Ala. at 546-47,58 So. at 630.[18] *Page 387 
Indeed, we have specifically recognized, with respect to public utilities providing electric service, that "the State . . . has the power to . . . authorize [them] to conduct their business ina particular area of the State." Alabama Power Co. v. Citizens ofthe State of Alabama, 527 So.2d 678, 683 (Ala. 1988) (emphasis added). Accordingly, we hold that the Act's assignment of particular service territories advances the legislatively determined public interest of preventing duplication and does not grant irrevocable exclusive franchises in violation of § 22.
 E. Vagueness
The trial court held that the Act's incorporation, by reference, of the Nonduplication Agreements makes the Act vague and ambiguous and thus violates the Due Process Clauses of the federal and Alabama constitutions. The Proponents argue that § 7 of the Act does not work any injury on the Opponents because the terms of the Nonduplication Agreements are binding only on the parties to those agreements and cannot be brought to bear on unsuspecting suppliers to whom they do not apply. The Opponents argue that the Act's incorporation of the Nonduplication Agreements by reference, instead of by inclusion of the full text of the agreements in the Act, infects the Act with unconstitutional vagueness.
The Legislature's approval of the Nonduplication Agreements as a means to eliminate unnecessary duplication of electric-service facilities constitutes a continuation of the PSC's well-settled practice in approving nonduplication agreements. See Ala. Code 1975, § 37-4-22; see, e.g., In reBirmingham Elec. Co. Alabama Power Co., APSC Docket No. 4729, 36 APSC 367 (1925) (approving a territorial agreement between two public utilities); In re Alabama Power Co., Order of the Commission, APSC Docket No. U2539 (Dec. 28, 1973) (approving a territorial agreement between a public-utility and an electric cooperative); In re Alabama Power Co., Order of the Commission, APSC Docket No. 16517 (Feb. 22, 1972) (approving a territorial agreement between a public-utility and a municipality). Further, it is undisputed that the Nonduplication Agreements, which are contained in the record, were timely filed with the Legislature and were read to the Legislature before it voted on the bill that became the Act. The Act itself states that the Nonduplication Agreements were "reviewed by the Legislature." Act No. 85-645, § 7. Thus, the Legislature had adequate notice of the contents of the Nonduplication Agreements incorporated into the bill that became the Act.
With respect to the public's notice of the terms of the Nonduplication Agreements, this Court has stated that the power to declare a statute void for vagueness
 "should be exercised only when a statute is so incomplete, so irreconcilably conflicting, or so vague or indefinite, that it cannot be executed, and the court is unable, by the application of known and accepted rules of construction, to determine, with any reasonable degree of certainty, what the legislature intended."
Jansen v. State ex rel. Downing, 273 Ala. 166, 170, 137 So.2d 47,50 (1962). The United States Court of Appeals for the Eleventh Circuit has stated that statutes violate the procedural-due-process guarantees when "(1) they fail to provide fair warning to citizens charged with their observance, and (2) by failing to provide clear guidelines, they lend themselves to arbitrary applications by those charged with their enforcement."Bama Tomato Co. v. United States Dep't of Agriculture,112 F.3d 1542, 1547 (11th Cir. 1997) (quoting Familias Unidas v. Briscoe,619 F.2d 391, 399 n. 8 (5th Cir. 1980)). *Page 388 
Those charged with observing the terms of the Nonduplication Agreements are the parties to those agreements, and they admittedly have full and adequate notice of the duties and obligations imposed on them by the agreements.[19] There is no contention that the Nonduplication Agreements fail to provide clear guidelines to the parties with respect to their duties and obligations.[20] Because the Act is not "so vague or indefinite, that it cannot be executed," we cannot hold it unconstitutionally vague on the particular grounds asserted by the Opponents. Jansen, 273 Ala. at 170, 137 So.2d at 50.
 F. Just Compensation
The trial court held that the Act's option-price formula generates too high a price and thus effects a taking of the payor's property in violation of the Takings Clauses of the federal and Alabama Constitutions. The option-price formula determines the price a primary electric supplier must pay to purchase the facilities of a secondary supplier located inside a municipality.[21] The Proponents argue that the Takings Clauses protect private property owners (the sellers) from having their property forcibly taken by the government without compensation at least equal to the fair value of the property taken. The Takings Clauses do not apply in this case, the Proponents argue, because the private property owners (the sellers) are not contesting the amount of compensation to be paid under the Act. The Opponents, particularly the municipal electric suppliers, argue that the option price is excessive under certain circumstances. They argue that the establishment of an excessive price, as well as the use of a legislative formula, instead of a judicial determination, violates the Takings Clause of theFifth Amendment of the Constitution of the United States and the Takings Clause of § 235 of the Constitution of Alabama of 1901.[22] *Page 389 
The Takings Clause of the Constitution of the United States provides:
 "No . . . private property [shall] be taken for public use, without just compensation."
U.S. Const. amend. V. This limitation on the power of the Federal Government to take property without just compensation also applies, through the Due Process Clause of theFourteenth Amendment, to limit takings by state governments. See, e.g.,Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992).
In this case, the secondary suppliers, the selling property owners, do not argue that the option price provided by the Act is too low. Instead, the municipal suppliers — the potential purchasers — contend that the option price is too high and that they are entitled to a judicial determination of just compensation. The federal Takings Clause, however, operates primarily to protect the owner of private property from having his property taken under compulsion by the government without just compensation. See Lucas, 505 U.S. 1003, 1014-18, 1019 n. 8. The Act does not compel the municipal suppliers, which would purchase the electric facilities of secondary suppliers, to part with their cash or other property and buy those facilities. The municipal suppliers may purchase or not, as they choose. Act No. 85-645, § 4(a). Thus, there is no constitutional "taking" from the purchasing municipal suppliers. The secondary suppliers, which would be required to sell their electric facilities to primary suppliers upon the exercise of the statutory option, make no complaint as to the sufficiency of the option price. The Supreme Court of the United States has stated:
 "Against the objection of the owner of private property taken for public use, the Congress may not directly or through any legislative agency finally determine the amount that is safeguarded to him by that clause. If as to the value of his property the owner accepts legislative or administrative determinations . . ., no constitutional question arises. But, when he appropriately invokes the just compensation clause, he is entitled to a judicial determination of the amount."
Baltimore Ohio R.R. v. United States, 298 U.S. 349, 368 (1936) (emphasis added). Because the owners of the secondary electric facilities accept the option price set forth in the Act, "no constitutional question arises." Accordingly, there is no federal constitutional question regarding the ultimate sufficiency of compensation for the Judiciary to determine.[23]
Section 235 of the Alabama Constitution provides in pertinent part:
 "Municipal and other corporations and individuals invested with the privilege of taking property for public use, shall make just compensation, to be *Page 390 ascertained as may be provided by law, for the property taken, injured, or destroyed by the construction or enlargement of its works, highways, or improvements, which compensation shall be paid before such taking, injury, or destruction."
Like the federal constitution, the Alabama constitution prohibits only compulsory takings. In addition, § 235 of the Alabama Constitution specifically provides for the Legislature to set the amount of just compensation. See Pickens County v.Jordan, 239 Ala. 589, 591, 196 So. 121, 123 (1940) (interpreting § 235 of the Alabama Constitution — which provides that compensation is "[t]o be ascertained as may be provided by law" — to "`leave to the Legislature the right to fix the measurement and method of proof in such cases, so that "just compensation" could be made'") (quoting Rudder v. LimestoneCounty, 220 Ala. 485, 490, 125 So. 670, 675 (1930)). Section 4(a)(4) of the Act establishes an option-price formula that the Legislature deemed appropriate for determining the amount necessary to compensate sellers. Accordingly, we hold that the Act's option-price formula has not been shown to violate § 235 of the Alabama Constitution.
 G. Section 61
On appeal the Opponents also argue that the Act's omission of the texts of the Nonduplication Agreements violates § 61 of the Constitution of Alabama of 1901, which requires that an act be passed by a bill. The Opponents did not raise this issue in the trial court, and the trial court did not rule on it. However, because an appellee can defend the trial court's judgment with an argument not raised in the trial court, and because this Court will sustain on appeal the trial court's judgment if that judgment is supported on any valid legal ground, we address the § 61 issue. See Marvin's, Inc. v. Robertson, 608 So.2d 391, 393 (Ala. 1992);Turner v. Clutts, 565 So.2d 92, 94 (Ala. 1990); Tucker v.Nichols, 431 So.2d 1263, 1264-65 (Ala. 1983); and Dougherty v.Hovater, 425 So.2d 1082, 1084 (Ala. 1983). As previously discussed, the Legislature and the parties subject to the Nonduplication Agreements were duly notified of the provisions of the Nonduplication Agreements. Existing Alabama law authorizes the PSC to approve such agreements. The bill that became the Act expressly incorporated the Nonduplication Agreements after they were reviewed by the Legislature. The bill incorporated the agreements as a means of effecting the purpose of that bill as introduced, that is, to eliminate unnecessary duplication of electric-service facilities. The bill did not revive, amend, extend, or confer the provision of any previous law in a constitutional sense. See generally In re Opinion of the JusticesNo. 138, 262 Ala. 345, 349, 81 So.2d 277, 281 (1955); compare Ala. Const. 1901, art. IV, § 61 (requiring only that an act be passed by means of a bill that reflects the original purpose of the bill as introduced), with § 45 (requiring that an amending bill reenact and republish the amended law at length instead of merely incorporating it by reference). Therefore, because the bill was original in form and complete within itself, we hold that the incorporation of the Nonduplication Agreements by reference does not violate the requirement of § 61 that all laws be passed by bill. See Boyd v. Edwards, 284 Ala. 459, 461, 225 So.2d 863, 865
(1969).
 IV. Cross Appeal
The trial court refused to dismiss the unnamed citizens of the State of Alabama and certain Co-ops and municipalities from this declaratory-judgment action. The Opponents argue that the trial court should have dismissed the citizens of the state and several of the named Co-ops and municipalities because, the Opponents say, those parties have no justiciable interest. The Proponents concede that the citizens of the state should have been dismissed, but argue that all of the named Co-ops and municipal suppliers have a justiciable *Page 391 
interest as electric suppliers affected by the Act.
Section 6-6-223, Ala. Code 1975, provides:
 "Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, municipal ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder."
Section 6-6-227, Ala. Code 1975, provides in pertinent part:
 "All persons shall be made parties who have, or claim, any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding."
This Court has held that to support a declaratory judgment there must be shown in the record an actual controversy wherein legal rights are affected. Town of Warrior v. Blaylock, 275 Ala. 113,114, 152 So.2d 661, 661 (1963); Scott v. Alabama State BridgeCorp., 233 Ala. 12, 17, 169 So. 273, 277 (1936).
The citizens of the State of Alabama were initially joined as parties to this declaratory-judgment action pursuant to § 9(d) of the Act, which provides that a judgment validating the Act "shall be forever conclusive against all citizens of the state, electric suppliers, municipalities and other governmental units." On remand from the first appeal in this case, in Alabama Power Co. v.Citizens of the State of Alabama, 527 So.2d 678, the trial court struck the validation provision of the Act. The parties do not appeal the trial court's ruling on the validation provision. Citizens, merely as consumers in general, have no cognizable legal rights at stake in this proceeding. See generally Storey v. Mayo,217 So.2d 304, 307-08 (Fla. 1968), cert. denied, 395 U.S. 909
(1969) (stating that a consumer of electricity has "no organic, economic or political right to service by a particular utility merely because he deems it advantageous to himself"). Accordingly, on remand the trial court should dismiss those citizens of the State of Alabama who are not individually named parties, have not participated in this action, and have no other connection with this action.
In contrast, the named electric suppliers are legally bound by the provisions of the Act to defined service territories. The Act actually and directly affects their legal rights and obligations. See, e.g., Act No. 85-645, § 3(a) (imposing the obligation of providing electric service to suppliers in areas outside municipal limits); § 4(a)(5) (providing that § 3 of the Act applies inside municipal limits if the primary supplier elects not to exercise its purchase option). Accordingly, the trial court did not err in refusing to dismiss the named electric suppliers from the action.
V. Conclusion
The Act is a valid exercise of the police power of the State of Alabama and does not suffer from any of the constitutional infirmities asserted by the Opponents. Those citizens of the state having no cognizable interest in this action are not proper parties, but the named electric suppliers, which are directly governed by the Act, are proper parties. Accordingly, we affirm the trial court's order refusing to dismiss the electric suppliers; we reverse the trial court's order holding the Act unconstitutional; we reverse the trial court's order refusing to dismiss those citizens of the state without any interest in the case; and we remand for further proceedings not inconsistent with this opinion.
OPINION OF DECEMBER 11, 1998, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED; AFFIRMED IN PART; *Page 392 
REVERSED IN PART; AND REMANDED.
Hooper, C.J., and Maddox, Houston, Lyons, Brown, and Johnstone, JJ., concur.
[1] Act No. 85-645 is codified at Ala. Code 1975, §§ 37-14-30 to -40.
[2] Both Act No. 85-645 and a similar act passed in 1984, Act No. 84-206, Ala. Acts 1984, were challenged in the Montgomery Circuit Court. The case was removed to the United States District Court for the Middle District of Alabama. Ultimately, the United States Court of Appeals for the Eleventh Circuit held that removal of the case was improper, Dixie Electric Cooperative v. Citizensof Alabama, 789 F.2d 852 (11th Cir. 1986), and the district court dismissed the action. The Montgomery Circuit Court then held that the validation mechanisms contained in each act that provided for addressing a broad array of challenges to both acts would require the court to rule on nonjusticiable issues. Unlike Act No. 84-206, Act No. 85-645 provides that its validation provisions are severable from the remaining provisions of that act. Act No. 85-645, §§ 9, 10. The Co-ops and APCo appealed only with respect to the remaining provisions of Act No. 85-645, and they do not challenge the trial court's ruling on the validation provisions of that act.
[3] The Fifth Amendment to the Constitution of the United States provides in pertinent part:
 "No person shall be . . . deprived of life, liberty, or property, without due process of law. . . ."
The Fourteenth Amendment to the Constitution of the United States provides in pertinent part:
 "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."
Section 6 of the Constitution of Alabama of 1901 provides in pertinent part:
 "[I]n all criminal prosecutions, the accused . . . shall not . . . be deprived of life, liberty, or property, except by due process of law. . . ."
Section 13 of the Alabama Constitution provides:
 "[A]ll courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay."
[4] Federal judges sometimes use the term "activist," or "activism," to characterize the judicial philosophy embraced by the Supreme Court of the United States during the Lochner era. See, e.g., United States v. Lopez, 514 U.S. 549, 605 (1995) (Souter, J., dissenting) (discussing the "Court's activism in limiting the enforceable scope of state economic regulation" and citing Lochner) (emphasis added); Honeywell, Inc. v. MinnesotaLife Health Ins. Guaranty Ass'n, 110 F.3d 547, 554 (8th Cir. 1997) (describing "the Lochner era, [as] named for the pivotal case of judicial activism") (emphasis added); Armenderiz v.Penman, 75 F.3d 1311, 1318 (9th Cir. 1996) ("The Supreme Court's opinion in Lochner v. New York, 198 U.S. 45 . . . (1905), now symbolizes an era in which the Court, invalidating economic legislation, engaged in a level of judicial activism which was unprecedented in its time and unmatched since.") (emphasis added);In re Chateaugay Corp., 53 F.3d 478, 487 (2d Cir. 1995) (stating that a prior decision of the Supreme Court "belongs to the long-discredited era of Lochner-style judicial activism") (emphasis added). Cf. Brooks v. Hobbie, 631 So.2d 883, 887 n. 3 (Ala. 1993) (noting that "`[o]ne striking aspect of the Warren Court's activism was its dramatic expansion of federal judicial intervention into state affairs'") (quoting Developments in the Law, The Interpretation of State Constitutional Rights, 95 Harv.L. Rev. 1324, 1349 n. 82 (1982) (emphasis added).
[5] Herbert Spencer, Social Statics (1872). Spencer espoused a Darwinian view of society and legislation. See Liva Baker, TheJustice from Beacon Hill 214 (1991).
[6] Justice Hugo Black provided a fitting retrospective on the Supreme Court's failed experiment with substantive-due-process review of economic legislation:
 "The doctrine that prevailed in Lochner . . . and like cases — that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely — has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. . . .
 ". . . We refuse to sit as a `superlegislature to weigh the wisdom of legislation,' and we emphatically refuse to go back to the time when courts used the Due Process Clause `to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.' . . . Whether the legislature takes for its textbook Adam Smith, Herbert Spencer, Lord Keynes, or some other is no concern of ours. [A statute] may be wise or unwise. But relief, if any be needed, lies not with us but with the body constituted to pass laws for the State. . . ."
Ferguson v. Skrupa, 372 U.S. 726, 730-32 (1963) (citations omitted).
[7] In addition to Justice Holmes, many other esteemed jurists emphatically rejected the expansive substantive-due-process review of economic legislation employed in Lochner. In 1926, Felix Frankfurter wrote, "Through its steady expansion of the meaningless meaning of the `due process' clause of theFourteenth Amendment the Supreme Court is putting constitutional compulsion behind the private judgment of its members upon disputed and difficult questions of social policy." Felix Frankfurter, "The Supreme Court as Legislator," in Felix Frankfurter on the SupremeCourt 181, 181 (Philip B. Kurland ed., Harvard Univ. Press 1970). In 1927, Justice Louis Brandeis acknowledged that the arguments against the application of the Due Process Clause to "matters of substantive law" were persuasive. Whitney v. California,274 U.S. 357, 373 (1927) (Brandeis, J., concurring). In 1958, Judge Learned Hand agreed, stating that the Supreme Court's experiment in reevaluating economic legislation under the guise of the Due Process Clause had temporarily transformed that court into a "third legislative chamber." Learned Hand, The Bill of Rights 36-42 (Harvard Univ. Press 1958).
[8] James Madison, the chief framer of the Constitution of the United States, stated:
 "[W]here the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution are subverted."
The Federalist No. 47, at 302-03 (James Madison) (Clinton Rossiter ed., 1961) (emphasis omitted).
[9] Indeed, we are reminded of the distinction between our plain black robes, which symbolize the limited power granted us by our Constitution, and the scarlet mantles of omnipotent Platonic Guardians. Compare Learned Hand, The Bill of Rights 56-77 (Harvard Univ. Press 1958) (discussing the questionable aggrandizement of power by Justices who acted more as "Platonic Guardians" than as judges), with John Marshall: Definer of aNation 285-86, 612 n. 33 (1996) (discussing the symbolic example of Chief Justice Marshall in abandoning the "scarlet and ermine of the King's Bench" for a "plain black robe" when he sat on the Supreme Court of the United States).
[10] The Opponents make similar arguments that two specific provisions of the Act violate their substantive-due-process rights: (1) the provision allowing competition for large new industrial customers, Act No. 85-645, § 3(b) and (c), by nonmunicipal electric suppliers; and (2) the provision including certain nonduplication agreements while excluding others, id. at § 7. Both arguments fail. First, the provision of the Act allowing only nonmunicipal suppliers to compete for large new industrial customers is rationally related to the legitimate purpose of avoiding undue duplication of facilities. The Legislature might conclude that, in general, suppliers that already have distribution facilities located outside municipal limits are less likely to produce duplicative costs when serving a new customer located outside municipal limits than are municipal suppliers, which generally do not have the same amount of such preexisting facilities. Second, the Act's approval of some nonduplication agreements between electric suppliers and not of others is also rationally related to the legitimate state purpose of preventing unnecessary duplication. The Legislature is in a far better position than this Court to evaluate, in light of its overall scheme, whether a specific agreement to prevent duplication in a particular geographic area advances the purposes of the Act. Section 7 of the Act states that the Legislature has reviewed and approved those Nonduplication Agreements and has determined that they are in the public interest. We cannot say that the Legislature's allowing certain competition and its approving certain Nonduplication Agreements are not rationally related to the legitimate purpose of avoiding wasteful duplication costs. See United States v. Carolene Products Co., 304 U.S. 144, 154
(1938); Williamson v. Lee Optical Co. of Oklahoma, Inc.,348 U.S. 483, 491 (1955).
Similarly, the Opponents' argument that nonmunicipal competition and selective approval of the Nonduplication Agreements violate their equal-protection rights is unavailing. See Pennell v. City of San Jose, 485 U.S. 1 (1988) (stating that to the extent an economic classification is rationally related to a legitimate state interest, the classification will comport with the Equal Protection Clause); Culpepper v. Phenix City, 216 Ala. 318,320, 113 So. 56, 58 (1927) ("[S]eparate and different regulatory treatment — the distinct classification by the Legislature of municipally owned and operated utilities and of other utilities — is not an unlawful discrimination, and is not a denial of the equal protection of the laws").
[11] While elaborate voluminous briefs including extensive factual and scientific information were essential tools in the heightened judicial scrutiny prevalent in the heyday of Lochner, the Legislature's findings are now presumed to be correct. Compare Muller v. Oregon, 208 U.S. 412 (1908) (upholding a state law regulating the work hours of women when the State supported the regulation with an imposing volume of scientific, economic, and legal documentation in the form of a Brandeis brief), withWilliamson v. Lee Optical Co. of Oklahoma, Inc., 348 U.S. 483
(1955) (exhibiting a willingness to hypothesize a set of facts supporting the economic regulation, without resorting to voluminous, fact-intensive briefs). See generally Henry Wolf Bikle, Judicial Determination of Questions of Fact Affecting theConstitutional Validity of Legislative Action, 38 Harv. L. Rev. 6 (1924) (discussing the use of Brandeis briefs).
[12] With respect to those Opponents that are municipal suppliers, we note that a municipality's statutory right to sell electricity, (e.g., Ala. Code 1975, § 11-50-1) may be expanded, limited, or eliminated by another statute (e.g., Ala. Act No. 85-645) enacted by the Legislature. City of Birmingham v. Norton,255 Ala. 262, 50 So.2d 754 (1951). With respect to those Opponents that are individual and corporate consumers of electricity, we note that consumers of electricity have no substantive-due-process right, or right protected by the doctrine of overbreadth, to choose their electric supplier. See generallyStorey v. Mayo, 217 So.2d 304, 307-08 (Fla. 1968), cert. denied,395 U.S. 909 (1969) (stating that a consumer of electricity has "no organic, economic or political right to service by a particular utility merely because he deems it advantageous to himself"); cf. Ross Neely Express, Inc. v. Alabama Dep't of Envtl.Mgmt., 437 So.2d 82, 85 (Ala. 1983) (noting that, in a rare case, a statute or regulation may be void for overbreadth if the provision is unnecessarily broad and invades protected freedoms).
[13] Section 106 of the Constitution of Alabama of 1901 provides in pertinent part:
 "No special, private, or local law shall be passed . . . unless notice of the intention to apply therefor shall have been published, without cost to the state, in the county or counties where the matter or thing to be affected may be situated. . . ."
[14] The cases cited by the Opponents do not alter our conclusion. In Hamilton v. Autauga County, 289 Ala. 419, 422-23,268 So.2d 30, 32-33 (1972), the chief feature of the statute was to stop the practice of paying sheriffs with the commissions and fees they collected and to replace it with a standard salary schedule based on population classifications. The statute, however, allowed sheriffs in certain counties to continue collecting commissions and fees and, through the subterfuge of narrow statutory classifications, set non-population-based salaries for sheriffs in certain counties. Id. at 422-24, 268 So.2d at 32-34. The parties conceded the local nature of the statute, id. at 425, 286 So.2d at 35. We note that the object of the statute — a sheriff's collecting commissions and fees — was present in every county of the state. But the statute's chief feature did not affect every county, because of the special rules for certain counties. Similarly, in Opinion of the Justices No.197, 284 Ala. 626, 227 So.2d 396 (1969), four Justices expressed the opinion that a bill purporting to allow elections in all dry counties for the purpose of determining whether the sale of alcohol would be allowed in municipalities in those counties was invalid as a local law. Although the object of the bill — dry municipalities — was present in every dry county, the bill excepted nine dry counties from the election provision and, thus, did not operate on every relevant county. Id. at 628, 227 So.2d at 398.
[15] We further note that if any Nonduplication Agreement is terminated by the parties pursuant to the terms of that agreement, § 7 provides that the "closer to" and "option" rules will govern the assignment of service territories once governed by that Nonduplication Agreement.
[16] Section 3(a) of the Act provides in pertinent part:
 "[E]ach electric supplier is hereby granted a legislative franchise and assigned the sole obligation . . . for provision of retail electric service to all new premises [in its assigned service area]. . . . No other electric supplier shall render electric service to such premises."
[17] Section 22 and its predecessors arose in reaction to the common-law rule that a utility franchise was "a grant of a property right of a contractual nature" that was "considered as a conveyance in perpetuity" and, thus, was "`immune from any interference or impairment.'" City of Bessemer v. BirminghamElec. Co., 248 Ala. 345, 352, 353-54, 27 So.2d 565, 571, 572
(1946) (citation omitted). See generally Trustees of DartmouthCollege v. Woodward, 17 U.S. (4 Wheat.) 518 (1819) (holding that the Contract Clause prevented a state from abrogating a charter granted to a college where the power to change the charter was not reserved in advance).
[18] We note that the Legislature has long exercised its police power by making exclusive grants of revocable franchises to numerous businesses that serve the public. See, e.g., Ala. Code 1975, § 37-4-28 (authorizing the grant of certificates of public convenience and necessity for the gas, electricity, water, and steam businesses); § 37-2-1 to -4 (authorizing the grant of certificates of public convenience and necessity for the railroad, common-carrier-by-water, telegraph-line, telephone-line, and oil-pipeline businesses); § 37-3-10, -13 (authorizing the grant of certificates for public convenience and necessity for the common-carrier and contract-carrier aircraft business); §37-1-32 ("[The Public Service Commission] shall examine . . . utilities as often as may be necessary to keep informed as to their general condition, their franchises, capitalization, rates and other charges. . . .") (emphasis added).
[19] We note that the consumers, who are not parties to the Nonduplication Agreements, have no constitutional right to use those agreements to obtain a different electric-service supplier. See Storey v. Mayo, 217 So.2d 304, 307-08 (Fla. 1968), cert. denied, 395 U.S. 909 (1969). Nonetheless, the Proponents have agreed to deposit the Nonduplication Agreements with the PSC so that those agreements will be as publicly accessible to all consumers as the nonduplication agreements that were filed with the PSC before the passage of the Act.
[20] The Opponents' contention that the Act fails to provide clear guidelines or standards for the future inclusion of new Nonduplication Agreements is similarly unavailing. The ultimate standard for the inclusion of a new agreement in the Act is the Legislature's judgment as to whether to amend the Act to incorporate the new agreement. Act No. 85-645, § 7. The Legislature has the discretion and the authority to add new agreements to the Act, just as it had the discretion and power to include the current Nonduplication Agreements in the Act. See generally City of Birmingham v. Southern Bell Tel. Tel. Co.,234 Ala. 526, 532, 176 So. 301, 305 (1937) ("`When the Legislature itself acts within the broad field of legislative discretion, its determinations are conclusive.'") (quoting St. Joseph Stock YardsCo. v. United States, 298 U.S. 38, 51 (1936)).
[21] Section 4(a)(4) of the Act provides that the option price to be paid by a primary electric supplier for a secondary electric supplier's facilities located within a municipality shall include: (1) approximately 70% of reproduction cost of the secondary supplier's distribution facilities; (2) the cost of removing the secondary supplier's meters; (3) the cost of constructing any necessary facilities to reintegrate the unpurchased portion of the secondary supplier's facilities into any other facilities retained by the secondary supplier; (4) the original cost, less depreciation, for nondistribution facilities purchased; and (5) two and one-half times the total revenue earned by the secondary supplier from electricity sales derived from customers within the municipal limits during the last 12 months (to be paid in 10 annual installments).
[22] We note that the trial court held in July 1986 that the notices given by several of the Opponents for the exercise of their purchase options were untimely. See Act No. 85-645, § 4(a)(1) (stating that notice of the intent to exercise a purchase option "must" be given within 30 days after the effective date of the Act — May 17, 1985). These Opponents failed to contest this holding when the constitutionality of the Act was first challenged on appeal in Alabama Power Co. v. Citizens of the State ofAlabama, 527 So.2d 678 (Ala. 1988). Accordingly, the ruling that these notices were untimely became the law of the case, and it may not be relitigated in this second appeal. Ex parte ArmyAviation Center Fed. Credit Union, 477 So.2d 379, 380-81 (Ala. 1985). We note, however, that the validity of the purchase-option mechanism could affect at least one other primary supplier that apparently did give timely notice. See generally Klein v.Jefferson County Bldg. Loan Ass'n, 239 Ala. 460, 464,195 So. 593, 596-97 (1940) (noting the importance of eliminating confusion and expense by determining constitutional questions under the Declaratory Judgment Act).
[23] Because we conclude that the Takings Clauses have not been violated with respect to the municipal electric suppliers, we pretermit discussion of their contention that the Legislature usurped the judicial function of determining what amount of compensation is just. See generally Monongahela Navigation Co. v.United States, 148 U.S. 312, 327 (1892). We note, however, that "Congress may, of course, provide in connection with condemnation proceedings that particular elements of value or particular rights be paid for even though in the absence of such provision the Constitution would not require payment." United States v. Fuller,409 U.S. 488, 494 (1973).